## HOLYOKE COMPANY *v.* LYMAN.

1. By the settled law of Massachusetts, the rights of fishery in such rivers as the Connecticut, even above the point where it is navigable for boats or rafts, are public rights, and, unless there be some express provision to the contrary, are subject to such reasonable regulations as the State may make for their protection; including the right to require of persons who own or build dams, that they construct such fishways as will enable migratory fish to pass from the lower to the higher level of the water occasioned by such dams.

2. The provision of the Revised Statutes of Massachusetts, chapter 44, section 23, and General Statutes, chapter 68, section 41, declaring that acts of incorporation shall be subject to amendment, alteration, or repeal, at the pleasure of the legislature; reserves to the legislature the authority to make any alteration or amendment of a charter granted subject to it, which will not defeat or substantially impair the object of the grant or any rights vested under it, and which the legislature may deem necessary to secure either that object or other public or private rights.

3. After a manufacturing corporation, chartered with authority to construct and maintain a dam across a river, paying damages to the owners of fishing rights above, and whose charter does not expressly exempt it from maintaining the dam without a fishway, and is subject under the provision above quoted to amendment, alteration, and repeal at the pleasure of the legislature, has paid such damages and constructed the dam without a fishway, so as to destroy the fishing rights above and to impair similar rights below (for the injury to which last no compensation has ever been made or provided), that corporation, or any other which purchases its dam under the authority of a subsequent statute, may be constitutionally required by the legislature to construct a fishway in the dam to the satisfaction of commissioners appointed by the legislature for the purpose.

ERROR to the Supreme Judicial Court of Massachusetts; the case being this:

The "General Laws"* of the State just named, provide that every act of incorporation passed since the 11th of March, 1831,

"Shall at all times be subject to amendment, alteration, or repeal *at the pleasure* of the legislature."

This general law being on the statute-book the legislature of the State in 1848 passed an act to incorporate the Hadley

---

* Chapter 68, § 41; Revised Statutes, chapter 44, § 23.

Falls Company, for the purpose of constructing and maintaining a dam across the Connecticut River, and of creating a water-power to be used by the corporation. The capital stock was fixed at $5,000,000, and it could hold $500,000 worth of real estate. The corporation was authorized and empowered "to construct and maintain a dam across the river" at a point named, sufficient to raise the water to a height not exceeding one specified. The act in its fourth section read thus:

"The said corporation shall pay such damages to the owners of the present fishing rights existing *above* the dam which the said company is herein empowered to construct, as may be awarded by the county commissioners of the counties in which said rights exist."

And a mode was provided by which either the company "or any owners of the said fishing rights" might at any time proceed to determine the damages done to *them*. Nothing was said about damages done to fishing rights *below* the dam, nor about making or maintaining, or not making and maintaining any "fishway." No power was given to condemn the land of others for the site of the dam or for any other purpose.

The Hadley Falls Company built at great expense a dam, but without any fishway in it. Before this dam was built shad were accustomed to pass up the river beyond the dam, and were of value to the private owners of riparian fishing rights for sale as food, and a source of income to such proprietors both above and below the dam. The dam, however, by preventing the passage of the fish up the river, destroyed the fishing rights above. And compensation to a large amount was made to the owners of fisheries above the dam for the injuries done to their said rights.

After the dam was built, and owing to it, the number of shad in the river below decreased in a small but appreciable degree; the dam preventing them from passing to their former spawning-grounds above; and to some extent causing them not to return to the river after their annual passage to

the sea.   No owners of fishing rights below the dam had, however, ever claimed damages on this account.

On the 31st of January, 1859, the Hadley Company having failed, the same legislature passed an act incorporating the *Holyoke* Water-power Company, "for the purpose of upholding and maintaining *the* dam across the Connecticut River, *heretofore* constructed by the Hadley Falls Company," and gave to the new corporation full power " to purchase, take, *hold, receive, sell,* lease, and dispose of *all* and any part of the *estate,* with all the water-*power,* water-*courses,* water-*privileges,* dams, rights, easements, and appurtenances thereto belonging, or therewith connected, which have at any time heretofore belonged to the Hadley Falls Company."

The part of the Connecticut River where this dam was constructed runs through the State of Massachusetts, and is not navigable.

In this state of things the legislature passed in 1866 and subsequently, certain statutes, which authorized the commissioners of fisheries of the State to examine the several dams on the rivers of Massachusetts, and after notice to the owners thereof, to determine and define the mode and plan upon which suitable and sufficient fishways should be constructed.   The statute regulated the plans, methods, &c., and provided that if any proprietor of any dam should refuse or neglect to agree with the commissioners to build the fishways for thirty days after a plan was duly furnished to him, the commissioners might build the same at his expense. Under and in pursuance of this legislation, the Holyoke Company was required to build a fishway in their dam. The fishway required was one that would cost about $30,000; and, as appeared, would not diminish the water-power of the company, except when they desired to add to it by what are known as "flash boards." The company refused to comply with the requirement, contending that the acts of incorporation to the two companies constituted contracts, that by the payment of damages to the owners of fishing rights *above* the dam the Holyoke Company had the right to maintain "*the* dam," theretofore constructed by the Hadley

Company, and that the acts of 1866, &c., were laws impairing the obligations of contracts, and so in violation of the Federal Constitution. The court below, on a proceeding authorized by the statute to make them do so, adjudged otherwise, and its judgment was now here for review.

*Mr. F. Chamberlin, for the plaintiff in error:*

1. Where an absolute right to do an act is given, a contract is made that the State will do no act to impair that absolute right. Thus if an absolute grant of land is made, the State cannot thereafter annex a condition restricting its use; or if power is given to erect a bridge of a certain character, the State cannot cause the owner to make an alteration in it. The same rule will apply to a right given without any reservation to make a dam.

In *The People* v. *Platt*,* the State of New York had granted lands on both sides of the Saranac River, without any reservation of the river, or any restriction on the use of it expressed in the grant. By a statute subsequently passed, owners of all dams were required to make fishways, and it was held that such a requirement was unconstitutional as to the defendants, because the unrestricted use of the land and river was given, and it could not be afterwards restricted.

In *Commonwealth* v. *New Bedford Bridge*,† a charter was granted to erect a bridge, with draws of a certain width, and it was held that a statute ordering draws of an increased width to be built was void. The court say:

"Nor can the legislature, without the assent of the defendants, in any way impair the original terms of the charter *by annexing new conditions or imposing additional burdens,* onerous in their nature or inconsistent with a reasonable construction of the compact."

In *West River Bridge Company* v. *Dix*,‡ this court gives the same construction of the clause of the Constitution about contracts on which we rely, and say:

"The language and meaning of the inhibition were designed

---

* 17 Johnson, 213.     † 2 Gray, 339.     ‡ 6 Howard, 533.

to embrace proceedings attempting the interpolation of *some new term or condition* foreign to the original agreement, and therefore inconsistent with and violative thereof."

Now in our case, we find an unreserved and unconditional right to erect and maintain a dam across the Connecticut River. Does not a statute that we shall erect a fishway at any cost which the State sees fit to require, interfere with our "perfect use and enjoyment of the thing granted?"

It is evident, also, that in granting these charters the legislature had this principle in mind; for it made a provision which was intended to reach the very matter of fishways. It provided that damages should be paid to certain persons supposed to be affected.

Will it be said that although there is no express reservation at all in the grant, yet that in Massachusetts, in all charters authorizing the erection of *dams*, there is an *implied* reservation, of a right to require the grantees to make any *fishways* in those dams which the legislature may think desirable? The position is not tenable; for the courts of that State have laid down no such general principle. They have only declared that owners of lands or privileges on streams, if they erect dams on them, do so subject to the usual rule that they must so manage them as not to interfere with the right of persons above or below, either to have the water flow, or to have fish pass.* But it follows not that when no reservation of power to cause fishways to be built has been made in the original contract, the State has power to "interpolate such term or condition foreign to the original agreement."

2. Even if in the State of Massachusetts there were an implied condition annexed to grants of power to build dams, the State, in the case at bar, has, by providing in our charter for this very right of fish passage, made another con-

---

* Stoughton *v.* Baker, 4 Massachusetts, 522; Commonwealth *v.* Chapin, 5 Pickering, 199; Vinton *v.* Welsh, 9 Id. 87; Commonwealth *v.* Essex Co., 13 Gray, 239.

tract, which, upon our accepting it and paying damages, as we have done, exempts us from any further requirement. This right to have fish pass up and down rivers is a *public* right solely. No owner of land above or below a dam can maintain any action against the builder of a dam which injures his fishery, nor proceed against the dam as a nuisance, nor is the owner liable to indictment.*    If, however, a provision for damages *is* inserted in a charter, it is clear that this additional consideration is paid for the relinquishment by the State of the right to thereafter demand fishways, or payment of other or further damages than those required; and a contract to that effect arises by *necessary implication*, as clearly as if it was expressed in terms.  For how unjust it would be, where only an *implied* condition of building a fishway existed, to put in an express condition that all damages should be paid, and then force the plaintiff, by building fishways, to give back to the owners what he had already paid them for the loss of.  Our view does not leave the State without remedy.  It may in the exercise of its right of eminent domain take back this right, by paying for it, as in all other similar cases.

3. Then will it be said that there is a general statute of Massachusetts, existing when this charter was made, which reserves the right to alter, modify, or repeal any charter theretofore granted, and that the State has the power under this statute to take back any right it has given *even* for a valuable consideration?  If this construction can be maintained all that a State has to do, in order to avoid the provision of the Constitution against the passage of laws impairing the obligation of contracts, is to pass a law saying in substance: " In all contracts I may hereafter make I reserve the right to break them if I see fit."  The constitutional provision cannot be evaded in such a manner.  But no such construction can be given to this statute.†  The distinction is this: The legislature may, under certain circum-

---

* Commonwealth *v.* Essex Co., 13 Gray, 239.

† Commonwealth *v.* Essex Co., 13 Gray, 239; and see Durfee *v.* Old Colony Railroad, 5 Allen, 230; Sage *v.* Dillard, 15 B. Monroe, 340.

stances, alter *the charter*, but they cannot do anything to affect or destroy any *rights of property acquired under the charter;* and if under such reservation they attempt to violate any contract they have made, they are met by a higher power than their own, which forbids it.

*Mr. C. R. Train, Attorney-General of Massachusetts, contra.*

Mr. Justice CLIFFORD delivered the opinion of the court.

Rivers, though not navigable even for boats or rafts, and even smaller streams of water, may be and often are regarded as public rights, subject to legislative control, as the means for creating power for operating mills and machinery, or as the source for furnishing a valuable supply of fish, suitable for food and sustenance. Such water-power is everywhere regarded as a public right, and fisheries of the kind, even in waters not navigable, are also so far public rights that the legislature of the State may ordain and establish regulations to prevent obstructions to the passage of the fish, and to promote the usual and uninterrupted enjoyment of the right by the riparian owners. Proprietors of the kind, if they own both banks of the water-course and the whole soil over which the water of the stream flows, may erect dams extending from bank to bank to create power to operate mills and machinery, subject to certain limitations and conditions, and may also claim the exclusive right of fishery within their territorial limits, subject to such regulations as the legislature may, from time to time, ordain and establish. Persons owning the whole of the soil constituting the bed and banks of the stream are entitled to the whole use and profits of the water opposite their land, whether the water is used as power to operate mills and machinery or as a fishery, subject to the implied condition that they shall so use their own right as not to injure the concomitant right of another riparian owner, and to such regulations as the legislature of the State shall prescribe. Where such a proprietor owns the land on one side only of the stream, his right to the land and to the use of the water,

whether used as power to operate mills and machinery or merely as a fishery, extends only to the middle thread of the stream, as at common law, and is subject to the same conditions and regulations as when the ownership includes the whole soil over which the water of the stream flows. Authority to erect dams across such streams for mill purposes results from the ownership of the bed and the banks of the stream, or the right to construct the same may be acquired by legislative grant, in cases where the legislature is of the opinion that the benefit to the public will be of sufficient importance to render it expedient for them to exercise the right of eminent domain and to authorize such an interference with private rights for that purpose. Lands belonging to individuals have often been condemned for such purposes, in the exercise of the right of eminent domain, in cases where, from the nature of the country, mill-sites sufficient in number could not otherwise be obtained, and that right is, even more frequently, exercised to enable mill-owners to flow the water back beyond their own limits, in order to create sufficient power or head and fall to operate their mills. Concomitant with the authority to erect such dams for such purposes over the beds of water-courses, as resulting from the title to the banks and bed of the stream, is also the exclusive right of fishery, which also has its source in the same ownership of the soil, and the better opinion is that it is not divested or extinguished by any legislative act condemning the land to the use of another for mill purposes, unless the words of the grant conferring the authority to construct the dam plainly indicate that such was the intention of the legislature. Water rights of the kind, whether the streams are used for mill purposes or merely as fisheries, are justly entitled to public protection, as they are in many cases of great value to the community where they exist, but they are the source of many conflicting interests which the State legislatures as well as the courts have found it difficult to adjust, as appears from the countless efforts which have been made in that behalf without complete success.

Certain persons, their associates and successors, on the twenty-eighth of April, 1848, were incorporated by the name of the Hadley Falls Company, for the purpose of constructing a dam across the Connecticut River, and one or more locks and canals, in connection with the said dam, to create a water-power to be used for manufacturing and mechanical purposes, and also for the purpose of navigation, with all the powers and privileges and subject to all the duties, liabilities, and restrictions set forth in the thirty-eighth and forty-fourth chapters of the revised statutes of the State.* Power and authority are given to said corporation to construct and maintain a dam across said river at South Hadley, at any point between the present dam of the proprietors of the locks and canals and the lower locks of the said proprietors, of a height sufficient to raise the water to a point not exceeding the present level of the water above the dam of the said proprietors; and the farther provision is that the corporation shall pay such damages to the owners of the present fish rights above the dam to be erected as shall be awarded by the county commissioner. Pursuant to the act of incorporation the stockholders accepted the charter, constructed the dam, paid certain damages to the owners of fish rights above the dam as constructed, and expended, as the respondents allege, more than two millions of dollars, including the cost of the dam and the damages paid to parties adversely interested, in constructing their improvements, and failed in business. New parties acquired the title to the dam and the other improvements, and on the thirty-first of January, 1859, the respondents in this case, as such new proprietors, their associates and successors, were incorporated by the name of the Holyoke Water-power Company, and they were empowered to uphold and maintain the dam and other improvements constructed by the prior company, and to erect and maintain a water-power to be used for the same purposes as those described in the prior charter, with the same powers and privileges and subject to the same lia-

---

* 8 Special Laws, 949; Revised Statutes, 828-366.

bilities and restrictions.*  Special power was conferred upon the governor, by and with the advice and consent of the council, by the act of the fifteenth of May, 1866, to appoint commissioners of fisheries in the said river and one other river, to hold their offices for five years unless sooner removed, and it was made their duty by the same act forthwith to examine the several dams on said rivers in said State, and after notice to the owners of the dams, to determine and define the mode and plan by which fishways shall be constructed, suitable and sufficient to secure the free passage of salmon and shad up said rivers during their accustomed seasons.  Said commissioners are also authorized to agree with the proprietors of such dams to construct at their own expense said fishways according to the plans adopted, if the proprietors consent so to do, and if they fulfil the agreement and the fact is duly certified to the secretary of state, the provision is that the same, for the period of five years, shall be taken and deemed as in lieu of the fishways which such a proprietor is now required by law to keep and maintain for that purpose.  Unless the proprietor of such a dam shall agree with the commissioners within thirty days from the time he is so furnished with the plan to build such fishway in the manner prescribed, the commissioners are authorized to construct the same in behalf of the State, and in that event the provision is that the expense shall be a charge against the owner of such dam, and the same may be recovered of the proprietor in an action of contract in the name of the State, or the commissioners may enforce the construction of such a fishway, by a bill in equity, to compel a specific performance.†  Due notice having been given by the complainants, as such commissioners, to the respondents as the owners of said dam, of their intention to examine the dam pursuant to the provisions of the aforesaid acts of the legislature, they proceeded to perform that duty and determined and defined the mode and plan in which

* Private Acts, 1859, 225.
† Sessions Acts 1866, 231; Id. 1867, 741; Id. 1869, 677–741.

the fishway should be constructed therein, suitable and sufficient to secure the free passage of salmon and shad over the dam and up the river during their accustomed seasons. They also furnished the respondents with the plan and specifications of such fishway, and filed a copy of the same in the office of the secretary of state, and requested the respondents to construct such a fishway or to agree with them as such commissioners to comply with that requirement, but it appears that the respondents refused and neglected so to do, insisting that the State had no power or right to require them to build such a fishway. Entirely different views were entertained by the complainants, and they instituted the present suit to compel the corporation respondents to comply with that requirement, and the State court entered a decree for the complainants.* Dissatisfied with that decree the respondents sued out the present writ of error and removed the cause into this court.

Ample power was vested in the first company to hold real estate, not exceeding five hundred thousand dollars in value, but their act of incorporation did not give the company any authority to condemn the real estate of another to any extent or for any purpose. They were required to "pay such damages to the owners of present fish rights existing above the dam" as should be awarded by the county commissioners of the counties in which said rights existed, and they might at any time apply to said commissioners to proceed, ascertain, and determine the damages to said fish rights, subject, however, to an appeal to a jury from such assessment, as in cases of assessment of damages for land taken for highways. Damages for injuries to fish rights above the dam were to be ascertained and assessed, but no authority was conferred to condemn the land of another for the site of the dam or for any other purpose, nor was any provision made to ascertain and assess the damages to fish rights below the dam, nor does either charter contain a provision exempting

---

* Commissioners on Inland Fisheries *v.* Holyoke Water-power Co., 104 Massachusetts, 451; Weston *v.* Sampson, 8 Cushing, 347.

the builders and owners of the dam from the obligation to construct suitable and sufficient fishways for the free passage of fish up the river during their accustomed seasons.

None of these propositions are controverted, but the respondents insist that the acts of the legislature under which they have been required to make the fishways in question, impair the obligation of the contract contained in the charter incorporating their grantors, and that those acts are inoperative and void as contravening the article of the Constitution which prohibits the States from passing any law impairing the obligation of contracts.

Such a charter, when accepted by the corporators, is undoubtedly a contract that the powers, privileges, and franchises granted shall not be restrained, controlled, or destroyed without their consent, unless a power for that purpose is reserved to the legislature in the act of incorporation or in some prior general law, in operation at the time the act of incorporation was passed.*  Private charters of the kind are held to be contracts, because they are based for their consideration on the liabilities and duties which the corporators assume by accepting the terms therein specified, and the general rule is that the grant of the franchise on that account can no more be resumed by the legislature or its benefits diminished or impaired, without the assent of the corporators, than any other grant of property or legal estate, unless the right to do so is reserved in the act of incorporation or by some immemorial usage or general law of the State, which was in operation at the time the charter was granted.†  Charters of private corporations duly accepted, it must be admitted, are executed contracts, but the different provisions, unless they are clear, unambiguous, and free of doubt, are subject to construction, and their true intent and meaning must be ascertained by the same rules of interpretation as other legislative grants.   Repeated de-

---

* Dartmouth College *v.* Woodward, 4 Wheaton, 709–712; Wales *v.* Stetson, 2 Massachusetts, 146.

† Pennsylvania College Cases, 13 Wallace, 213.

cisions of this court have established the rule, that whenever privileges are granted to a corporation, and the grant comes under revision in the courts, such privileges are to be strictly construed against the corporation and in favor of the public, and that nothing passes but what is granted in clear and explicit terms.* Whatever is not unequivocally granted in such acts is taken to have been withheld, as all acts of incorporation and acts extending the privileges of corporate bodies are to be taken most strongly against the corporations.†

Evidently the right of fishery, as well as the right to use the water of a stream for mill purposes, is the subject of private ownership, and when held by a good title, the one as much as the other is a vested right, and both alike are entitled to public protection, and are subject, in a certain sense, to legislative regulation and control. Difficulties, in every case, attend the proper adjustment of such rights, as the complete enjoyment of the one may interfere with the corresponding enjoyment of the other, but the presumption is, in construing any regulation upon the subject, that the framers of the regulation did not intend to allow either party to disregard the rule that he should so use his own property as not to injure the property of the owner of the other right.

Ownership of the banks and bed of the stream, as before remarked, gives to the proprietor the exclusive right of fishery, opposite his land, as well as the right to use the water to create power to operate mills, but neither the one nor the other right nor both combined confer any right to erect obstructions in the river to prevent the free passage of the fish up and down the river at their accustomed seasons, as such obstructions would impair and ultimately destroy all such rights owned by other proprietors both above and below the obstruction on the same stream. Authoritative support to

---

* Rice *v.* Railroad Co., 1 Black, 380; Charles River Bridge v. Warren Bridge, 11 Peters, 544.

† Sedgwick on Statutes and Constitutional Law, 339; Lees *v.* Canal Company, 11 East, 652.

these views is found in the judicial decisions and legislative enactments of the State throughout her history, commencing even before the Revolution, and continued in an unbroken series to the present time.*

Undoubtedly each proprietor of the land adjoining such a river or stream has in that State a several or exclusive right of fishery in the river immediately before his land, to the middle of the river, and may prevent all others from participating in it, and will have a right of action against any who shall usurp the exercise of it without his consent, but the Provincial Statute of 8 Anne, ch. 3 (A.D. 1709),† prohibited all persons, "without approbation or allowance," from placing in or across rivers or streams any weir, hedge, or other incumbrance to obstruct the free passage of fish in the proper seasons of the year.  Persons who erect or build a dam across any river or stream where the salmon, shad, ale-wives, or other fish usually pass up into the natural ponds to cast their spawn, were required by the Provincial Statute of 15 George II, ch. 6 (A.D. 1741), to make a sufficient passageway for the fish to pass up such river or stream, and the owners of dams, so constructed that such fish could not conveniently pass up the river or stream, were required to make such a passageway and keep it open for a certain period in each year, as therein prescribed.‡  Laws of the kind, requiring the owners of dams across the rivers and streams of the State, to build fishways and keep them in repair, have been passed, in numerous instances, since the State constitution was adopted, many of which are still in full force. Such laws usually require the owners of the dam to build the fishway at their own expense, and subject their doings in that behalf to the approval of some supervisory board or committee.§  Reference was made at the argument to some thirty-five or forty statutes of the kind, passed at different periods, commencing the year the constitution of the

---

* Commonwealth v. Chapin, 5 Pickering, 204.

† 1 Provincial Laws, 162.

‡ Ib. 297; Ib. 17 Geo. II (A.D. 1743), 313; Ib. 19 Geo. II (A.D. 1745), 321.

§ 2 Laws of Massachusetts, Appendix, 1020–1026.

State was adopted (1780) and coming down to the present time, covering a period of more than ninety years.*

Statutes also encouraging mills by authorizing their owners or occupants to overflow the lands of other persons, by paying such damages as may be assessed in the mode prescribed, are also of very ancient origin, and have received the sanction of the courts of the State throughout the whole period of her history.†

Public rights, in all jurisdictions, are subject to legislative control, and it is settled law in Massachusetts, and has been for a century and a half, including her colonial history, that the right of fishery in such rivers as the Connecticut and Merrimac, even above the point where they are navigable for boats or rafts, and the right to erect and maintain dams to create water-power for mill purposes, are public rights, and that the owners of such rights are bound by such reasonable regulations as the State may make and ordain for their protection and enjoyment.

All persons, say the Supreme Court of that State, in the case of *Stoughton* v. *Baker*,‡ who may build a dam for mill purposes, on a stream annually frequented by fish, do it under an implied obligation to keep open sufficient sluices and fishways for the passage of fish at the proper seasons, and that the grant of the right to erect a dam, if made by the legislature, is to be construed to be under the same implied condition to keep open the fishways, unless such implication is excluded by an express provision exempting the grantees from such an obligation. By the statement of facts in that case it appears that the defendants' dam was an ancient dam; that they deraigned their title from the original

---

* Vinton *v.* Welsh, 9 Pickering, 90; Angell on Waters (6th ed.), 72; Washburn on Easements (2d ed.), 501; Peables *v.* Hannaford, 18 Maine, 106; Parker *v.* Mill Dam Co., 20 Id. 353.

† 1 Provincial Statutes, 12 Anne, ch. 1 (A.D.1709), 160; Ib. 12 Anne, ch. 8 (A.D. 1714), 181; Ancient Charter, 388–404; 2 Laws of Massachusetts, 729; Revised Statutes (1836), 676; Angell on Waters (6th ed.), 664; Washburn on Easements, 332; Murdock *v.* Stickney, 8 Cushing, 119.

‡ 4 Massachusetts, 528.

proprietor, who acquired his right thereto in 1633 by a grant from the town within whose limits the mill-site was then situated; that the grant included the mill privilege and a weir adjoining the mill, and the exclusive right of fishery; that the grant was subsequently confirmed by the legislature, and that no fishway was ever made through the dam until the year 1789, when one was constructed at the expense of third parties, pursuant to a resolution passed by the legislature of the State; that on the fifteenth of March, 1805, the legislature appointed a committee to examine the dams on that river and to order such alterations to be made in the fishways as in their opinion would be sufficient for the convenient passage of the fish at said dam. Three-fourths of the expenses were to be borne by the owners of the dams and one-fourth by the towns interested in the fisheries. Suitable fishways were accordingly constructed, and the towns having paid the whole expense instituted a suit to recover one-fourth of the expense of the owners of the dam. Able counsel appeared on both sides, and the opinion of the court was delivered by Chief Justice Parsons, all of the other justices concurring. Based on these facts it was contended for the defendants that the original grant was a bar to the claim, but the court, conceding that the grant as confirmed amounted to a franchise of a several fishery, nevertheless held that the franchise could not be construed to include the right of excluding all fish from passing above the weir, the court giving as a reason for the conclusion that the value of a fishery in such a stream depends upon the shoals of fish that enter the river and pass to the ponds above to cast their spawn, adding that if none were allowed to pass, the public would lose their supply, and that the fishery would become of little or no value. Evidence was introduced tending to show that the franchise of the exclusive fishery was lost by non-user, but the court held that the said franchise, if it was not lost, would be no objection to the right of the public to have a convenient passageway for the fish to ascend the river to the ponds. They also held that the original proprietor took a fee in the mill-privilege, and that he

had the right to erect the dam to raise water sufficient to operate his mill, but that the right to build a dam for the use of a mill was subject to the following limitations: (1.) That the proprietor must make compensation to the owners of the lands above the dam for damages occasioned by overflowing their lands. (2.) That he must so construct the dam that the fish will not be interrupted in their passage up the river to cast their spawn, adding that every owner of a water mill or dam holds it on the condition that a sufficient and reasonable passageway shall be allowed for the fish.*

Substantially the same questions were presented to the Supreme Court of the State in the case of *Vinton* v. *Welsh*,† in which the opinion of the court was delivered by Chief Justice Parker, and the decision was in the same way and to the same effect. He decided that the owners of dams across such rivers, as well as the owners of such fisheries, hold their property subject to such regulations as the legislature from time to time shall prescribe for the preservation of the fish, basing his conclusion chiefly upon the fact that the colonial and provincial governments, as well as the government of the State under the State constitution had exercised the right of prescribing such regulations from the first settlement of the country to the date of the decision in that case.‡

Litigations upon the subject ceased for a time, but the same questions thirty years later were again presented to the Supreme Court of the State in the case of *Commonwealth* v. *Essex Company*,§ in which the opinion of the court was delivered by Chief Justice Shaw, as the organ of the whole court. Special reference is made in that opinion to the prior decisions of the court upon that subject, and all the leading cases here referred to are approved and the propositions decided are reaffirmed, the court announcing the fol-

---

* Burnham *v.* Webster, 5 Massachusetts, 266; Nickerson *v.* Brackett, 10 Id. 212; Commonwealth *v.* McCurdy, 5 Id. 324; Cottrill *v.* Myrick, 12 Maine, 229.

† 9 Pickering, 92.          ‡ Commonwealth *v.* Chapin, 5 Pickering, 204.

§ 13 Gray, 248.

lowing conclusions: That from the earliest times the right of the public to the passage of fish in rivers and the private rights of riparian proprietors, incident to and dependent on the public right, have been subject to the regulation of the legislature; that the mode adopted by the legislature, whether by public or private acts, to secure and preserve such rights, has been by requiring, in the erection of dams, such sluices and fishways as would enable these migratory fish, according to their known habits and instincts, to pass from the lower to the higher level of the water occasioned by such dam, so that, although their passage might be somewhat impeded, it would not be thereby essentially obstructed.  It appears in that case that the company was duly incorporated with power to construct a dam across the Merrimac River at Lawrence, subject to the condition, among other things, that they should construct suitable fishways in their dam for the passage of migratory fish; that they applied to the county commissioners, requesting them, after due notice, to prescribe the mode in which they should construct such fishways in their dam; that such notice was given and a hearing had, and that the commissioners did prescribe the mode in which the company should comply with that requirement, and that the company did construct such fishways in their said dam according to the mode and plan so prescribed; that the fishways, however, as constructed, proved to be unsuitable and insufficient to provide as convenient passageway for the fish.*  Circumstances occurring subsequently made it necessary for the company to ask for leave to increase their capital stock, and the legislature, in granting their application, also provided that the company should be liable for all damages occasioned to the owners of fish rights above the dam by the stopping or impeding the passage of the fish up and down the river by the said dam, and that such damages should be assessed by the county commissioners of the county in which such fish rights existed, saving to the respective parties the right to apply

---

\* 8 Special Laws, 470.

for a jury to make such assessment in the manner provided for the recovery of damages from laying out highways.* Having accepted the amendatory act, the company availed themselves of that provision and caused the damages to the fish rights existing above the dam to be assessed, and they paid the several assessments to the owners of the same, amounting to the sum of twenty-six thousand dollars, "as damages for hindering or impeding the passage of fish by their said dam, with the aforesaid fishways therein, as previously constructed." Such fishways did not admit of the usual and unobstructed passage of the fish, as required by the law of the State and the seventh section of their act of incorporation. Complaints subsequently arose and the company was indicted for such neglect and the case came to trial, and the jury, under the rulings and instructions of the court, found the defendants guilty, and they excepted to the rulings and instructions of the court and the case was heard before the full court. Unquestionably the case was fully considered, and the court in the first place reaffirmed all of their previous decisions upon the subject, which hold that persons who build a dam for mill purposes on a stream frequented by migratory fish, do it under an implied obligation to keep open sufficient sluices and fishways for the passage of the fish in their accustomed seasons, and that every grant to erect such a dam is to be construed as under the same implied condition, unless such implication is excluded by an express provision to that effect. Still the court held that the legislature had the power to regulate the public right, and in view of the fact that the amended charter substituted a new proceeding for the recovery of damages by the owners of the fish rights, and that the same, as assumed by the court, had been executed, the court also held that the amended charter had in it all the elements of a contract executed by one party and binding on the other, and that it was not competent for the legislature, even under the power reserved in a prior general law, to amend, alter, or repeal

---

* 8 Special Laws, 990.

any such charter to require the proprietors of the dam, *without any change of circumstances*, to construct the fishways, which by the terms of the amended charter they had been exempted from any obligation to construct, basing their opinion upon the ground that the right acquired under that provision had become vested by a legitimate exercise of the power granted.*

Vested rights, it is conceded, cannot be destroyed or impaired under such a reserved power, but it is clear that the power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant and to protect the rights of the public and of the corporators, or to promote the due administration of the affairs of the corporation.†

Had it appeared in that case that the amended charter contemplated the assessment of damages for fish rights owned below the dam as well as those owned above the dam, the opinion would certainly be more satisfactory, as in that event the theory assumed by the court that all the parties damaged in their fisheries had been indemnified by the owners of the structure would be correct.‡   Fish rights below a dam, constructed without passageways for the fish, are liable to be injured by such a structure as well as those owned above the dam, as the migratory fish, if they cannot ascend to the head waters of the stream at their accustomed seasons will soon cease to frequent the stream at all, or in greatly diminished numbers.

Suppose the rule, however, to be correct, still it is quite clear that it does not control the case before the court for the reasons given by the same court in rendering the decree brought here for re-examination by the present writ of error. Passageways for the fish had been constructed in that case under the act passed incorporating the company, but they proved to be unsuitable and insufficient, and the court in sustaining the views of the defendants rested their decision upon the ground that the amended charter discharged them

---

* Sessions Acts 1831, 613.
† Miller *v.* The State, *supra*, p. 478.
‡ Moulton *v.* Libbey, 37 Maine, 484.

from the obligation to reconstruct such fishways, as the amended charter required them to make compensation for the injuries to the fish rights in the place of the prior obligation arising from the rules of the common law of the State and the terms of their original charter, the court holding that the government could not, *without any change of circumstances*, require the defendants to do the very acts which, by the terms of the amended charter, they had been exempted from doing, but the court declined to decide whether, if the fishways provided should prove to be wholly unfit and inadequate to their purpose the legislature could not by further legislation require the company to fulfil the original obligation. Sufficient appears to warrant the conclusion that no evidence was introduced in that case to show that the fish rights below the dam suffered any injury whatever, nor does it appear that the attention of the court was drawn to the fact that the river across which the dam was built runs through more than one State.\* Different rules perhaps may be applied in ascertaining the power of a State legislature to authorize permanent obstructions to the free passage of fish in a river flowing through two or more States, like the Connecticut or Merrimac, from the rules which should be applied in a case where the river across which the dam is constructed is wholly within the State which authorizes the structure, but it is not necessary to consider that question in this case, as it was not raised in the State court nor was it presented here by either party.

Fishways have never been constructed by the respondents in their dam, and they contend that they are not obliged to make any such provision for the passage of the fish, as their charter does not create any such obligation; but the answer which the complainants make to that suggestion is decisive, that the charter does not contain any provision exempting them from that implied obligation, which arises in every such case by the common law of that State, unless the charter contains some provision which expressly negatives that

---

\* Moor *v.* Veazie, 32 Maine, 353; Veazie *v.* Moor, 14 Howard, 571.

implication. Even suppose that is so, still they contend that the fourth section of the charter of their grantors should be construed as negativing any such implied condition, but the court is entirely of a different opinion, as that section makes no provision for any compensation to the owners of the fish rights below the dam, and the record shows that such fish rights, as well as those above the dam, are injured by the obstruction to the free passage of the fish in their accustomed seasons to the head waters of the river. Authority to construct and maintain a dam without a fishway, it is conceded, is not granted in terms in the charter, and it may be added that the charter does not contain any words to warrant any such implication. On the contrary, the terms and provisions of the charter are consistent with the theory that the legislature contemplated the construction of a dam with a convenient passageway for fish, so as not to impair unnecessarily the rights of the riparian owners either above or below the dam, and that the legislature, if the company failed to fulfil that obligation, may "compel them to do so by more specific legislation." Damages, it is true, were to be paid to "the owners of present fish rights existing above the dam," but the court here, in respect to that matter, concurs with the State court that the meaning of the sentence is satisfied by regarding it as providing for a partial interruption and injury of those rights and not as contemplating their utter destruction; that the legislature which granted the charter may well have supposed that a dam across the river at that place, with the best fishway that could be constructed, would, to some extent, obstruct the free passage of the fish, and may have intended by that provision to require the owners of the dam to make compensation for such injuries.

Viewed in any reasonable light it is quite clear that the charters of the respondents do not contain any stipulation or contract exempting them from the implied condition annexed to such a grant, not qualified by such a contract, that the corporation in erecting such a dam shall construct suitable and convenient fishways for the free passage of the fish

to the headwaters of the river in their accustomed seasons; and that the charter, in view of the fact that it contains no such exemption, is subject to the power reserved to the legislature by the general law, in operation when the charters were granted, that all acts of incorporation shall at all times hereafter be liable to be amended, altered, or repealed at the pleasure of the legislature. Such charters being subject to the implied condition to construct suitable fishways for the free passage of the fish, it follows that the corporations are not exempt from that burden, and that the legislature under the reserved power to amend, alter, or repeal the charter, may pass laws to enforce that duty, as such a law does not impair any contract created by the charter or infringe any right vested in the corporation.* Charters subsequently granted must be understood as standing just as they would if that reservation of the power to amend, alter, or repeal the same had been incorporated into each charter.† Power to legislate, founded upon such a reservation, is certainly not without limit, but it may safely be affirmed that it reserves to the legislature the authority to make any alteration or amendment in a charter granted, subject to it, that will not defeat or substantially impair the object of the grant, or any rights which have vested under it, which the legislature may deem necessary to secure either the object of the grant or any other public right not expressly granted away by the charter.‡

Such a charter may doubtless be granted to build a dam across a river whose whole course is within the State granting the franchise, with a provision exempting the corporation from all obligation to construct such fishway for the free passage of the fish, as the enterprise of erecting a dam to create power to operate mills is so far public in its nature that it is competent for the legislature to exercise the power of eminent domain to accomplish the purpose, if suitable

---

* Revised Statutes, 366; Pennsylvania College Cases, 13 Wallace, 213.

† Miller v. The State, supra, p. 478.

‡ Commissioners on Inland Fisheries v. Holyoke Water-power Co., 104 Massachusetts, 451.

provision is made to compensate the owners of the property or rights condemned under that power, but it may be more doubtful whether the legislature of a State can make a contract with such a corporation authorizing them to construct a dam across a river flowing through two or more States, which shall permanently exempt the grantees from all such obligation and destroy forever the rights of fishery in the river throughout its whole course from its source to its confluence with tide waters.

Concede, however, that the power to make such a contract exists, and that it is as boundless as the theory of the respondents assumes it to be, still the court here is of the opinion that the decree of the State court is correct and that it should be affirmed, as the charters under which the dam in this case was erected and is maintained do not contain any such exemption from the implied obligation to construct fishways for the free passage of the fish, nor any provision which prohibits the legislature from imposing that obligation under the power reserved to amend, alter, or repeal the charter.

Properly construed neither of the charters affords any support whatever to the theory of the respondents, as they do not contain any semblance of a grant to take and subvert the fish rights below the dam, nor is there anything in the provision requiring compensation to be made to the owners of the fish rights above the dam, which is not perfectly consistent with the theory that it was incorporated into the charter merely to compensate the owners of such fish rights for injuries which they would suffer from the obstruction, even if the customary fishways were constructed as required by immemorial usage and the express enactment of the legislature.

DECREE AFFIRMED.