IN THE MATTER OF THE PETITION FOR DISSOLUTION
OF COLLINS-DOAN COMPANY.

LOUIS G. MORTEN, ISRAEL DOAN, MARY G. DOAN AND
ALFRED K. MOE, PETITIONERS-APPELLANTS, v. SAM-
UEL B. COLLINS, HARVEY A. COLLINS AND COLLINS-
DOAN COMPANY, DEFENDANTS-RESPONDENTS.

Argued November 14, 1949—Decided December 19, 1949.

384

*Mr. John W. Griggs* argued the cause for appellants. *Mr. William J. Morrison, Jr.,* on the brief (*Messrs. Morrison, Lloyd & Griggs,* attorneys).

*Mr. William E. Decker* argued the cause for respondents.

The opinion of the court was delivered by

HEHER, J. The question here is whether the respondent corporation, Collins-Doan Company, is subject to dissolution under *R. S.* 14:13–15. The issue was resolved in the affirmative by Judge Grimshaw in the Chancery Division of the Superior Court and in the negative by the Appellate Division of that court. Judge Donges dissented from the judgment of reversal. 1 *N. J. Super.* 441; 4 *N. J. Super.* 385. The case is here pursuant to Article VI, section V, paragraph 1

(a), 1 (b) of the Constitution of 1947 and Rule 1:2–1 (a), 1 (b) of this court.

The corporation was organized December 16, 1916, under the General Corporation Act of 1896. *P. L., p.* 277; *Comp. Stat.* 1910, *p.* 1592. The articles of incorporation declared that the primary object of the company was "to acquire and take over as a going concern" the commercial printing business then carried on in Jersey City by the appellant Israel Doan and the respondent Samuel B. Collins as co-partners under the firm name and style of Collins and Doan. The company was thereby authorized to issue 250 shares of capital stock of the par value of $100 each, consisting of 100 shares of preferred stock and 150 shares of common stock. There was provision for a cumulative dividend of 6% per annum on the preferred stock, payable semi-annually out of the surplus or net earnings before the payment of any dividend on the common stock. The preferred stockholders were given the usual priority on the liquidation or dissolution of the company; and there was a stipulation for the redemption of this class of stock "by vote of a majority of the whole board of directors," at any time after three years from issue, "at a price not less than par value." It was provided also that the holders of the preferred stock "shall have equal representation on the board of directors with the holders of the common stock." 105 shares of the common stock were issued to Collins; 100 shares of the preferred stock were issued to Doan; and five shares of the common stock were issued to Moe, a lawyer, for legal services rendered in "the organization of the company." Thus, the corporation commenced business with a capital fund of $21,000, represented by the property and assets of the partnership transferred and conveyed to the corporation in consideration of the issue of the stock.

The by-laws adopted December 20, 1916, provide for the election of two directors by the holders of the preferred stock "by a plurality vote," and two directors by the holders of the common stock, likewise "by a plurality vote." Moe has served as a director of the Company since its organization. In 1936, Doan transferred a portion of his preferred stock to the appel-

lant Morten, also a lawyer; and he was elected to the board of directors. More recently, Doan transferred some of his preferred stock to his wife, Mary G.; and Collins assigned 25 shares of the common stock to his son, Harvey A. The directorate now comprise Doan and Morten, elected by the preferred stockholders to afford that class the "representation" provided by the articles of incorporation and the by-laws, and Collins and Moe, chosen to "represent" the interests of the holders of the common stock.

But differences between these independent interests have resulted in a deadlock in the board of directors and in the stock ownership and a consequent failure of corporate function in the manner provided by the statute governing such entities. The plan devised to afford the holders of each class of stock an equal voice in the management of the corporate affairs has made for corporate inaction. While there have been annual elections of directors, the board has been chosen in conformity with the cited provisions of the articles of incorporation and the by-laws for equal representation in the Company's directorate of the holders of preferred and common stock, each class as a unit; and thus the disagreements, beginning in 1937, as to policy and management could not be resolved by corporate action. These controversies are now insoluble, so much so that Moe joins in the petition for dissolution of the corporation. Moe testified that he considered himself "morally obligated to vote in the same manner as Mr. Collins;" and he is convinced the differences are irreconcilable.

No dividends have been paid on the preferred stock since 1932. In 1937, dissension arose over the continued failure of such dividends and the use of corporate profits for the payment of increased salaries and commissions to Collins and his son and the disbursement of corporate funds without the sanction of the board of directors. On February 4, 1946, Collins, in the name of the corporation, took a lease on a building owned by his son at an annual rental of $4,200 and moved the Company's plant there, and then leased the vacated building owned by the Company at an annual rental of $3,600. The

making of the lease and the change of business *situs* were without the approval of the board of directors; indeed, without prior notice of Collins' intention to his associate directors. For want of directorial action, Collins has since 1937 operated the business as if it were his own property. There were no directors' meetings between 1938 and February 4, 1946, when the same executive officers were elected. But the deadlock continued; there was no other business transacted at that meeting. It is clear there was a continuance thereafter of the dissension which made corporate action utterly impossible. From 1937 on, there has been no corporate authority for the disbursements made by Collins of the Company's funds. The gross amount of the Company's printing business for the fiscal year preceding the taking of the testimony herein was $146,000. Collins was in charge of sales and his son had the general management of the business; but Collins testified that he had then been "on leave of absence" for three years and his son had the full management, all without directorial sanction. Asked if there was corporate authority for this action, he replied: "There was no business transacted by the board of directors; I had no authority; I just quit." He never again "associated" himself "actively" with the direction of corporate affairs, although he negotiated a lease with his son for the present business house. He admitted he did not consult his associate directors regarding the lease; he said: "It was something that had to be acted on quickly and I did it." When asked if he made an effort to communicate with his fellow directors respecting the proposed lease, he replied in the affirmative; but he then explained that he could not telephone to Doan "because he (Doan) has no 'phone." And he didn't write to Doan "because he doesn't answer his mail." He continued: "I have always used my judgment in the affairs of the corporation and I did so on that." Collins conceded that the Company's profits were sufficient to permit of the payment of dividends on the preferred stock; and there can be no doubt that the nonpayment of dividends was the primary cause of the stalemate. Moe termed it "a perennial reason for dissension."

In a word, the holders of the preferred stock are convinced that it was and is Collins' purpose so to manage the corporate affairs as to defeat their right to the cumulated dividends. But, whatever the motive, the result has been a failure of function of the directorate and the arrogation by Collins to himself of the management of the corporate business, exercised directly or through his son. Collins concedes that the differences are irreconcilable. Thus, dissension has rendered the directorate impotent; and the like equal division of interest and voting power among the stockholders put it beyond their power to cure this paralysis of function by the election of a directorate of an uneven number.

The act of incorporation is a compact between the corporation and the sovereignty whence its powers came, and as well between the corporation and its stockholders and between the stockholders *inter se*. *The Trustees of Dartmouth College v. Woodward*, 4 *Wheat.* 518, 4 *L. Ed.* 629 (1819); *Home Building and Loan Association v. Blaisdell*, 290 *U. S.* 398, 54 *S. Ct.* 231, 78 *L. Ed.* 413, 88 *A. L. R.* 1481 (1934). The duration of the franchise grant is ordinarily indeterminate; but where, as here, corporate function can no longer be had due to irreconcilable differences between two independent classes or groups of stockholders of equal voting power, the corporation is subject to dissolution in the interest of the public and the shareholders who may suffer injury. Dissolution does not constitute an impairment of the obligation of contracts made with creditors and others, for resort may be had to the property of the corporation in the mode provided by statute, or, if there be no adequate statutory remedy, by the processes of equity. A corporation does not have an absolute right to existence in perpetuity. The obligation of the contract between the sovereign power and the corporate entity is not so far-reaching; it is fundamental in every such contract that the corporation is subject to dissolution at the instance of the state of its creation, as for condition broken, by a forfeiture of its franchises for willful misuser and nonuser or for like cause, adversely affecting the essence of the contract, whereby its continued existence would

run afoul of the interests and public policy of the State. This is of the very nature of such bodies politic; and the contracts between the corporate entity and its stockholders and creditors are all conditioned accordingly. *Terrett v. Taylor,* 9 *Cranch.* 43, 3 *L. Ed.* 650 (1815); *Mumma v. The Potomac Co.,* 8 *Pet.* 281, 8 *L. Ed.* 945 (1834); *Bacon v. Robertson,* 18 *How.* 480, 15 *L. Ed.* 499 (1856); *Lum v. Robertson,* 6 *Wall.* 277, 18 *L. Ed.* 743 (1867); *Holyoke Water-Power Co. v. Lyman,* 15 *Wall.* 500, 21 *L. Ed.* 133 (1873); *Petrogradsky Mejdunarodny Kommerchesky Bank v. National City Bank of New York,* 253 *N. Y.* 23, 170 *N. E.* 479 (1930); *Lillard v. Lonergan,* 72 *Fed.* 2d 865 (1934); *certiorari* denied, 293 *U. S.* 615, 55 *S. Ct.* 147, 79 *L. Ed.* 704 (1934).

Here, the corporate entity whose dissolution is sought came into being subject to the statutory provisions (a) that all amendments of the General Corporation Act shall constitute "a part of the charter of every corporation heretofore or hereafter formed" thereunder, except so far as inapplicable or inappropriate; (b) that the act may be amended or repealed at the pleasure of the legislature, and every corporation created thereunder "shall be bound by such amendment or repeal;" and (c) that the charter of every corporation or any supplement thereto or amendment thereof "shall be subject to alteration, suspension and repeal, in the discretion of the legislature, and the legislature may at pleasure dissolve any corporation." *P. L.* 1896, *c.* 185, §§ 4, 5, *pp.* 278, 279; *Comp. Stat.* 1910, *pp.* 1600, 1601, §§ 4, 5; *R. S.* 14:2–8, 14:2–9. A corporate charter granted under a general enabling act embodies all the provisions of the constitution and the statute under which it is issued and all other applicable general laws; and if there be conflict in this regard the charter yields to the constitution and the statute. *General Investment Co. v. American Hide and Leather Co.,* 97 *N. J. Eq.* 214 (*Ch.* 1925); affirmed. 98 *N. J. Eq.* 326 (*E. & A.* 1925). It is within the competency of the legislature to reserve the right of alteration and repeal of a corporate charter by general statute; and such reservation, as to charters thereafter issued, "will have precisely the same effect as if inserted in the char-

ter. Under a general statute of this description, charters of incorporated companies thereafter granted, are repealable, although there is no clause in the charter reserving such right." *State, Morris & Essex R. R. Co., Pros., v. The Commissioner of Railroad Taxation,* 37 *N. J. L.* 228, 237 (*Sup. Ct.* 1874). See, also, *Holyoke Water Power Co. v. Lyman, supra; Shiloh Turnpike Co. v. Bates,* 80 *N. J. L.* 171, 174 (*Sup. Ct.* 1910). The right thus reserved extends to the contract between the State and the corporation; and the contractual rights of the stockholders *inter se* are not proof against "alteration required by the public interest." *Berger v. United States Steel Corporation,* 63 *N. J. Eq.* 809 (*E. & A.* 1902) ; *Group No. 23 of the Association of the Sons of Poland v. Association of the Sons of Poland,* 121 *N. J. Eq.* 102 (*E. & A.* 1936) ; *Bucsi v. Longworth Building & Loan Association,* 119 *N. J. L.* 120 (*E. & A.* 1937) ; *McSweeney v. Equitable Trust Co.,* 16 *N. J. Misc.* 193 (1938) ; affirmed, 127 *N. J. L.* 299 (*E. & A.* 1941), appeal dismissed, 315 *U. S.* 785, 62 *S. Ct.* 805, 86 *L. Ed.* 1191 (1941).

This is an apt case for the application of *R. S.* 14:13–15, cited *supra.* The act is derived from chapter 303 of the Laws of 1938 (*P. L., p.* 697) ; it embodies the principle of section 51 (d) of the Uniform Business Corporation Act (9 *ULA*), taken from section 103 of the General Corporation Law of New York. It is therein provided that every corporation organized under the State's general corporation acts may be dissolved by decree in Chancery when it is made to appear that the company has "an even number of directors who are equally divided respecting the management of its affairs, and that" its "voting shares * * * are equally divided into two independent ownerships or interests and one-half thereof is owned or controlled by persons favoring the course or views of part of the directors, and one-half is owned or controlled by persons favoring the course or views of the other directors, or that the persons owning or controlling the voting shares are unable to agree on, or vote for, the election of a board of directors consisting of an uneven number, and, in either such event, the holders of shares entitling them

to exercise one-half or more of the voting power shall have voted for such dissolution, or shall have agreed in writing thereto, or shall join in filing the petition for dissolution." It is further provided that the petition for dissolution "may be filed by one-half of the directors when there is an even number of directors who are unable to agree as to management, if the holders of one-half or more of the shares have voted for or agreed in writing to such dissolution, or it may be filed by the persons holding one-half of the voting shares when such persons are unable to agree with the persons holding the other half of such shares as hereinabove provided."

Here, the corporation has an even number of directors who are equally divided respecting the management of its affairs; the voting shares of the corporation are equally divided into two independent ownerships or interests with the same division of view as to policy and management as the deadlocked directorate; the shareholders for the same reason cannot terminate the stalemate by the election of a directorate of an uneven number, and the holders of shares consisting of one-half or more of the voting power have joined in this petition for dissolution; and thus the statutory prerequisites for the exercise of the dissolutional power are met.

There is no alternative course. For ten years or more the Company has not functioned as ordained by the law; and irreconcilable differences between the equally divided shareholders and directors render a resumption of function impossible. Collins has managed the corporate business as if it were his own individual interest and responsibility; indeed, in recent years he has delegated the managerial office to his son, although he has exercised a measure of superintendency. Apart from the violation of the interests of the other shareholders, there is in this course of action a flouting of the fundamental policy of the General Corporation Act which warrants intervention under the statute. *R. S.* 14:7–1 provides that the "business of every corporation shall be managed by its board of directors, not less than three in number." And the statute has in view also the protection of the interests of the shareholders. There is no corporate function here. The

business is under the management of one who happened to be serving in·that capacity when the deadlock occurred; and the direction has become personalized to the exclusion of all other interests. If the statute has no efficacy here, then it can have no practical utility or meaning. Such interposition is justifiable in the public interest where, as here, corporate action cannot be had. Apart from other considerations, the act constitutes legislative action within the cited reserved power. *Kean v. Johnson,* 9 *N. J. Eq.* 401 (*Ch.* 1853); *Berger v. United States Steel Corporation, supra.*

At the common law, a corporation is subject to dissolution for "nonuser or neglect." *Rex v. Amery,* 2 *T. R.* 515, 567 (1788). Abuse of power and delinquency constitute a ground of dissolution, it was held in *Rex v. Pasmore,* 3 *T. R.* 244 (1789). Ashurst, J., there said: "For if the fact be that a corporation is so reduced that it cannot act as a body corporate, it is fit the Crown should interpose." Blackstone speaks of "forfeiture" of the corporate charter "through negligence or abuse of (the corporate) franchises." 1 *Blackstone's Comm.* 485. "A corporation may be dissolved; for it is created upon a trust, and if that be broken, it is forfeited," said the King's Bench in *Sir James Smith's Case,* 4 *Mod.* 53, 58, 1 *Show.* 280, *Skin.* 310 *S. C.* At common law, the remedy is by information in the nature of a *quo warranto.* Ordinarily, barring an enabling statute, the ouster of a corporate franchise may be had only at the instance of the state. *Heard v. Talbot,* 7 *Gray, Mass.,* 113 (1856). In *Slee v. Bloom,* 5 *Johns. Ch. Rep., N. Y.* 366, 380 (1821), Chancellor Kent said that it was then the settled rule that a corporation may be dissolved for a breach of trust. And in *Terrelt v. Taylor,* cited *supra,* Mr. Justice Story declared that "A private corporation created by the legislature may lose its franchises by a misuser or a nonuser of them; and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture. This is the common law of the land, and is a tacit condition annexed to the creation of every such corporation." In *People v. Bristol and Rensselaerville Turnpike Road,* 23 *Wend., N. Y.,* 222, 235 (1840).

Cowen, J., said that a corporation "must come up to all the substantial objects for which it was instituted. · If it depart from any one of these, it is guilty of a breach of trust. It was made a political body on the implied condition that it should demean itself faithfully and honestly in the use of all its franchises. * * * To work a forfeiture, there should be something wrong; and not only a wrong, but one arising from willful abuse or improper neglect. An inability, through misfortune, to answer the design for which the body politic was instituted, is also cause of forfeiture. That, however, is on a distinct reason, not so directly material, and of which it is not necessary to say much. The prosecution before us goes on corporate default, or corporate wrong, which must, I think, be more than accidental negligence, or a mere mistaken excess of power, or a mistake in the mode of exercising an acknowledged power. There must be an abuse of trust somewhat of such a nature as would render a trustee liable to forfeit his station, on the complaint of his *cestui que trust,* if the question stood on the relation between them. Corporations are political trustees. Have they fulfilled the purposes of their trust, or acted in good faith with a view of their fulfillment, is the question to be asked, when they are called on to forfeit their charter, either for acts of commission or omission; unless indeed they are so generally crippled and broken down in their affairs, as, in the judgment of a court and jury, to be incapable of prosecuting their business with safety to that community who granted the charter, and who hold the relation of *cestui que* trust." A corporation may be dissolved "by a forfeiture of its charter, through abuse or neglect of its franchises, as for condition broken; there being a tacit condition in every such grant, that the corporation shall act up to the end of its institution." *Chesapeake and Ohio Canal Co. v. The Baltimore and Ohio Rail Road Co.,* 4 *Gill & Johns., Md.,* 1. In *Rex v. Pasmore, supra,* Buller, J., stated the principle thus: "There is a compact between the crown and a certain number of his subjects, the latter of whom undertake, in consideration of the privileges which are bestowed, to exert themselves for the good government of the place. Now, if

those persons have so far violated their trust, by negligence or misconduct, that they are no longer capable of governing the place, there is an end of the compact. The ground of the charter was the government of the place." The existence of "a private contract of the corporation" cannot "force upon it a perpetuity of existence contrary to public policy, and the nature and objects of its charter." *Mumma v. The Polomac Co., supra.*

Chancery's inherent jurisdiction over trusts embraces the power to administer the assets of a dissolved corporation. *Trustees of Sea Isle City Realty Co. v. The First National Bank of Ocean City,* 87 *N. J. Eq.* 84 (*Ch.* 1917). See, also, *Flemming v. Heffner & Flemming,* 263 *Mich.* 561, 248 *N. W.* 900 (1933). Now, under the Constitution of 1947, the Superior Court is invested with both law and equity jurisdictions; and both classes of remedies may be administered in one proceeding. *Article VI, section III, paragraphs* 3, 4; *Steiner v. Stein,* 2 *N. J.* 367 (1949).

In fine, where dissension among the shareholders of a corporation is such as to work a paralysis of corporate function, the sovereign power whence the franchise came has an interest that will sustain its intervention for the dissolution and liquidation of the corporation. And it may intervene, too, for the protection of shareholders. Certainly, dissolution was within the contemplation of the shareholders here if differences arose which could not be composed. This is the principle of the statutory provision invoked here. The act is designed to operate where there is "a stalemate in corporate management." *In re Evening Journal Association,* 1 *N. J.* 437 (1948). The power proceeds from the same source and has the same quality as that exerted against insolvent corporations and those in default in the payment of the franchise tax. The act itself suggests the legislature deemed the subject matter of public concern.

A dissolution was granted under the like provision of the New York statute where the stock was equally divided between two independent interests, one of which desired to sell the stock unissued and the other of which was opposed. This was

deemed to be a "variance upon a vital program of business management" which called for the dissolution of the corporation, because of the "possibility" of "a stalemate in management." *In re Brown*, 181 *N. Y. Supp.* 460 (1920).

In the case at hand, there is a want of that community of interest essential to corporate operation. Dissolution will serve the interests of the shareholders as well as public policy. The interests of the shareholders are so discordant as to preclude efficient management for the welfare of all, not to mention the complete lack of direction in the corporate form. It would seem that this particular statutory provision for dissolution is but a declaration of a power existing at common law. And, if the statutory authority be deemed discretionary in essence, there is no ground for withholding its affirmative exercise here, for there is no alternative corrective remedy. Redress for the corporate omissions may be had only by dissolution. The dissension is such as to defeat the end for which the corporation was organized. The deadlock in the corporation's internal management is fatal to its existence.

It is evident that the shareholders cannot agree on the election of a directorate of an uneven number; and so there is no occasion to determine whether the absence of proof of that element would affect the exercise of the statutory discretion. Appellants deem this to be an "alternative ground" for dissolution. In that view, the disjunctive "or" and the subsequent phrase "and, in either such event" are considered decisive.

The judgment of the Appellate Division of the Superior Court is reversed and the judgment of dissolution rendered in the Superior Court is affirmed.

OLIPHANT, J., concurring in result.

*For reversal*—Chief Justice VANDERBILT. and Justices CASE, HEHER, OLIPHANT, WACHENFELD, BURLING and ACKERSON—7.

*For affirmance*—None.