# INTERNATIONAL BRIDGE COMPANY v. PEOPLE OF THE STATE OF NEW YORK.

## ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 46. Argued December 16, 1919; restored to docket for reargument January 26, 1920; reargued October 11, 12, 1920.—Decided November 22, 1920. ·

1. In an action to recover penalties from a bridge company for failure to build foot and carriage ways upon its railway bridge as required by an act amending its charter, it is premature to inquire whether a distinct and independent provision, reducing the tolls chargeable for vehicles and pedestrians below the limits fixed in the charter, impairs the obligation of the charter contract, since the invalidity of the toll reductions would not affect the requirement to build the additions. P. 130.

2. Under acts of New York and Canada consolidating a New York with a like Canadian corporation, the new company constructed a bridge over the Niagara River for railroad uses only. The original charters provided for constructing foot and carriage ways also, that of New York in permissive but that of Canada in mandatory language, and the acts of consolidation bound the new company to all the duties of each of its constituents. *Held:* (1) That the new company had no charter contract immunity from being required to add the foot and carriage ways in New York under power reserved by the State to amend the charter, and that such requirement was not inconsistent with the contract clause of the Constitution; nor, in the absence of anything to show that the additions would not yield a reasonable return, could it be held to violate the Fourteenth Amendment. *Id.*

3. The Act of June 30, 1870, c. 176, 16 Stat. 173, in recognizing as a lawful structure any bridge constructed across the Niagara River in pursuance of New York Laws, 1857, c. 753, and amendments (Laws 1869, c. 550), subject to the supervision of the Secretary of War and his approval of the plans, recognized that the existence of the bridge company and its right to build on New York land came from New · York; and the facts that the bridge when built, as a railroad bridge

only, was devoted wholly to international commerce and that Congress by the Act of June 23, 1874, c. 475, 18 Stat. 275, declared it a lawful structure and an established post route for mail of the United States, did not supplant the authority of the State to require the company to equip the bridge with ways for foot passengers and vehicles as contemplated by its charter. P. 131.

4. The Act of 1874, *supra*, by declaring the bridge lawful as built, did not repeal the authority given by the Act of 1870, *supra*, to build subject to the approval of the Secretary of War, and the fact that this bridge was twice rebuilt without foot and carriage ways with the Secretary's consent, but under plans approved by him and providing for such additions in future, supports rather than negatives the view that the power of the State to require them was contemplated throughout and that Congress did not seek to divest it. *Id.*

5. The mere fact that a bridge is international, crossing an international stream, does not of itself divest the State of power over its part of the structure, in the silence of Congress. P. 133.

6. The Act of March 3, 1899, § 9, c. 425, 30 Stat. 1151, in requiring the assent of Congress to the erection of bridges over navigable waters not wholly within a State, does not make Congress the source of the right to build but assumes that the right comes from the State. *Id.*

7. The conveyance of a part of the land under the bridge to the United States for a public purpose not connected with the administration of the Government did not affect the authority of New York over the residue within the State, and taken in connection with the acts of the Government before and after the grant does not invalidate, even in part, the New York act requiring the additional construction. P. 134.

223 N. Y. 137, affirmed.


THE case is stated in the opinion.


*Mr. Adelbert Moot* and *Mrs. Helen Z. M. Rodgers*, with whom *Mr. Henry W. Sprague* and *Mr. William L. Marcy* were on the briefs, for plaintiff in error.


*Mr. James S. Y. Ivins*, with whom *Mr. Charles D. Newton*, Attorney General of the State of New York, *Mr. Ralph A. Kellogg* and *Mr. E. C. Aiken* were on the briefs, for defendant in error.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a suit brought by the State of New York to recover penalties from the Bridge Company for failure to place upon its bridge a roadway for vehicles and a pathway for pedestrians between Squaw Island in Niagara River and the mainland of New York State as required by c. 666 of the Laws of 1915 of the State of New York. The defendant set up that the act was contrary to the Constitution of the United States in specified respects, but the plaintiff got judgment in the Supreme Court, which was affirmed by the Court of Appeals. 223 N. Y. 137.

The Bridge Company originally was incorporated by a special charter from the State of New York. Laws of 1857, c. 753. As the bridge was to cross the Niagara River from Buffalo to Canada, a similar corporation was created under the laws of Canada, 20 Vict. c. 227, and subsequently the two corporations were consolidated, pursuant to Laws of New York, 1869, c. 550, and a Canadian Act, 32 and 33 Vict. c. 65, subject to all the duties of each of the consolidated companies. By the Act of Congress of June 30, 1870, c. 176, 16 Stat. 173, any bridge constructed across the Niagara River in pursuance of the New York Act of 1857 and any acts of the New York legislature then in force amending the same was authorized as a lawful structure subject to the supervision of the Secretary of War and his approval of the plans. By the New York Act of 1857, "Said bridge may be constructed as well for the passage of persons on foot and in carriages and otherwise as for the passage of railroad trains," § 15. And "whenever the said bridge shall be complete for the passage of ordinary teams and carriages" the company may erect toll gates and charge tolls not exceeding certain rates for foot passengers, carriages, &c. The original Canadian Act had words similar to those just quoted from

§ 15, except that it said "shall be constructed" instead of "may be," a fact to which we shall advert again.

Between 1870 and 1874 the bridge was built as required by the charter with one draw across Black Rock Harbor and one across the main channel of the river. It crossed Squaw Island on a trestle, afterwards filled in, but was built as a railroad bridge exclusively without any provision for footpaths or roadways. By the Act of Congress of June 23, 1874, c. 475, 18 Stat. 275, it was declared a lawful structure and an established post route for the mail of the United States. In the year 1899 a plan for rebuilding the bridge with wings for roadways and footpaths was approved by the Secretary of War subject to changes at the expense of the Company if the Secretary should deem them advisable. The rebuilding took place in 1899–1901, but omitted the wings, and this modification was assented to by the Secretary of War.

The Niagara River is navigable at this point. In pursuance of plans for improvement adopted by the United States, in 1906 it acquired from the State of New York the land under Black Rock Harbor, lying on the New York side of Squaw Island, and the adjacent portions of the Erie Canal, both being within the limits of the State and crossed by the bridge. Thereafter the improvements were carried out.

In 1907 the Secretary of War gave notice to the Company that the bridge over Black Rock Harbor and Erie Canal obstructed navigation and that changes were required. The Company submitted plans again showing in dotted lines wings for roadways and footpaths, noting that they were not to be put in at present but that provision was made in the design for their future construction. The plans were approved and the bridge was built without the wings, the completion being reported by his resident representative to the Secretary of War.

By c. 666 of the laws of New York for 1915, the charter

of the Company was amended so as to require the construction of a roadway for vehicles and a pathway for pedestrians upon the draw across Black Rock Harbor, the Company being allowed to charge tolls not exceeding specified sums. The Company failed to comply with the requirement and the time. limit had expired before this suit was brought to recover penalties imposed by the act. It is found that the construction was necessary for the public interest and convenience; that the cost of the changes is insignificant in comparison with the assets and net earnings of the Company, and that it does not appear that the investment would not yield a reasonable return.

The first objections to the new requirement made by the State are that it impairs the obligation of the contract in the original charter and takes the Company's property without due process of law. The argument is based partly upon a reduction of the tolls from those mentioned in the charter of 1857, made by the Act of 1915. Concerning this it is enough to say that the objection is premature. The clause relating to the construction of the roadway and pathway is distinct from and independent of that which fixes the maximum rates to be charged. The latter might be invalid and the former good. If the rates are too low they can be changed at any time. The only question now before us is whether the additions shall be built. As to that it would be going very far in the way of limiting the reserved right to amend such charters, if it should be held that the State had not power to require what originally was contemplated in permissive words as part of the scheme. But however that might be, the New York Act authorizing consolidation subjected this consolidated corporation to the duties of the Canadian as well as of the New York charter, and the Canadian Act made the arrangement for foot passengers and carriages a duty. The words that we have quoted plainly impose one. The

opinion in *Attorney-General* v. *International Bridge .Co.,*
6 Ont. App. 537, 543, implies that they do so by speaking
of the abandonment of a portion of the work as probably
an abuse of the Act of Parliament, and the same is clearly
stated in *Canada Southern Ry. Co.* v. *International Bridge
Co.,* 8 App. Cases, 723, 729.

It is argued that, the Canadian Act governing only the
Canadian side, its adoption by New York carried the
obligation no farther. But it appears to us that it would
be quibbling with the rational understanding of the duty
assumed to say that the Company could have supposed
that it had a contract or property right to confine its
building of the footpath and carriage-way to the Canada
side of the boundary line.

The New York legislature of course confined its com-
mand to the half of the bridge within its jurisdiction. It
may be presumed that if that command is obeyed either
Canada or the Company will see the propriety of carrying
the way and path across to the other shore. At all events
the power of New York to insist upon its rights is not
limited by speculation upon that point. As we agree with
the Court of Appeals that this amendment to the charter
was within the power reserved to the State the objection
under the contract clause of the Constitution of course
must fail, and, it would seem, that under the Fourteenth
Amendment also. But as to the latter we may add, as
the Court of Appeals added, that there is nothing to show
that the addition to the structure will not yield a reason-
able return; if that be essential in view of the charter. *Mis-
souri Pacific Ry. Co.* v. *Kansas,* 216 U. S. 262. *Chesa-
peake & Ohio Ry. Co.* v. *Public Service Commission,* 242
U. S. 603.

The only argument that impresses us and the one that
was most pressed is that this is an international bridge,
and that Congress has assumed such control of it as to
exclude any intermeddling by the State. It is said that

the bridge as constructed was and is devoted wholly to
international commerce and that when Congress author-
ized it in that form in 1874 that authority must be re-
garded as the charter under which it was maintained.
Without repeating the considerations urged in support of
this conclusion we will state the reasons that prevail with
us.—The part of the structure with which we are con-
cerned is within the territorial jurisdiction of the State of
New York. There was no exercise of the power of emi-
nent domain by the United States. The State was the
source of every title to that land and, apart from the
special purposes to which it might be destined, of every
right to use it. Any structure upon it considered merely
as a structure is erected by the authority of New York.
The nature and qualifications of ownership are decided by
the State and although certain supervening uses consistent
with those qualifications cannot be interfered with by the
State, still the foundation of a right to use the land at
all must be laid by state law. Not only the existence of
the Company but its right to build upon New York land
came from New York, as was recognized by the form of
the original Act of Congress of 1870, which speaks of any
bridge built "in pursuance of" the New York statutes.
It did not, as perhaps the New York Consolidation Act
did, refer to those statutes simply as documents and
incorporate them, it referred to them as the source of the
Company's power.

From an early date the State has been recognized as
the source of authority in the absence of action by Con-
gress. *Willson* v. *Black-Bird Creek Marsh Co.,* 2 Pet. 245.
*Escanaba Co.* v. *Chicago,* 107 U. S. 678. And this Court
has been slow to interpret such action as intended to ex-
clude the source of rights from all power in the premises.
In a case of navigable waters wholly within a State, over
which a right of way had been conveyed to the United
States and which the United States was spending con-

siderable sums to improve, it was held that, whether or not Congress had power to authorize private persons to build in such waters without the consent of the State, an act making comprehensive regulations of work within them did not manifest a purpose to exclude the previously existing authority of the State over such work. *Cummings* v. *Chicago*, 188 U. S. 410, 413, 428, *et seq.*

But it is said that a different rule applies to an international stream and that Congress has recognized the distinction by the Act of March 3, 1899, c. 425, § 9, 30 Stat. 1151. It is true that that statute makes a distinction, but the distinction is that bridges may be built across navigable waters wholly within the State if approved by the Chief of Engineers and the Secretary of War, but, with regard to waters not wholly within the State, only after the consent of Congress has been obtained. The act does not make Congress the source of the right to build but assumes that the right comes from another source, that is, the State. It merely subjects the right supposed to have been obtained from there to the further condition of getting from Congress consent to action upon the grant.

No doubt in the case of an international bridge the action of a State will be scrutinized in order to avoid any possible ground for international complaint, but the mere fact that the bridge was of that nature would not of itself take away the power of the State over its part of the structure if Congress were silent, any more than the fact that it was a passageway for interstate commerce or crossed a navigable stream. When Congress has acted we see no reason for not leaving the situation as Congress has seemed to leave it, if on the most critical examination we discover no intent to withdraw state control, but on the contrary an assumption that the control is to remain. We have adverted to the implications of the general law of 1899 and have mentioned the statutes that deal specifically with

this bridge. The Act of 1874 declaring the existing bridge lawful was a confirmation which it was natural to seek but was not a repeal of the authority given to the Company in 1870 to build subject to the approval of the Secretary of War. The superstructure has been rebuilt since 1874 and the Secretary of War twice has approved plans showing the carriage and footways. It is true that the Company never has sought to execute that part of the plan, but on the facts that we have stated it appears to us a strange contention that it has contract or property rights not to be required to build the bridge or that Congress by implication has forbidden the State to demand that the plan recognized by everyone from the beginning should at last be carried out.

The conveyance of a part of the land under the bridge to the United States for a public purpose not connected with the administration of the Government did not affect the authority of New York over the residue within the State, and taken in connection with the acts of the Government before and after the grant does not invalidate the statute of 1915 even in part. See *Cummings* v. *Chicago*, 188 U. S. 410, 413. *Fort Leavenworth R. R. Co.* v. *Loue*, 114 U. S. 525. *Omaechevarria* v. *Idaho*, 246 U. S. 343, 346.

*Judgment affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE McKENNA and MR. JUSTICE McREYNOLDS, dissent.