## CITY OF NEWARK et al. v. CENTRAL R. CO. OF NEW JERSEY et al.

(District Court, D. New Jersey. February 15, 1923.)

1. **Navigable waters ⟾20(2)—Congress may at any time exercise its paramount authority respecting bridges.**

In the absence of action by Congress, a state may authorize the construction of a bridge over navigable waters wholly within the state; but mere inaction of the federal government when such a structure is built imposes no obligation on it not to exercise subsequently its paramount authority.

2. **Navigable waters ⟾20(2)—Federal legislation respecting bridges excludes state control.**

Act March 3, 1899, § 9 (Comp. St. § 9971), requiring consent of Congress to the building of bridges over navigable waters, and Bridge Act 1906, §§ 1, 2 (Comp. St. §§ 9961, 9962), requiring approval of the plans for any such bridge by the War Department, and providing that a bridge built in accordance with the act shall be a lawful structure, constitute an exercise of the paramount constitutional power of Congress over such structures, which has the effect of excluding all control by the states.

3. **Navigable waters ⟾20(2)—Authority to build bridge carries right to rebuild.**

Authority granted by a state to a railroad company to build a bridge, in view of the permanent character of the use intended, carries with it the right to repair or to rebuild to meet the needs of the road.

4. **Navigable waters ⟾20(2)—Local authorities held without power to prevent replacement of bridge.**

The consent of neither the state board of commerce and navigation of New Jersey nor that of the Port of New York Authority *held* necessary to the replacement by a railroad company of a bridge on its right of way, constructed under state authority and in use for many years before either body was created.

In Equity. Suit by the City of Newark, the Mayor and Aldermen of Jersey City, and the State of New Jersey against the Central Railroad Company of New Jersey and The Port of New York Authority. On motion by complainants for preliminary injunction, and by defendant Railroad Company to dismiss bill. Bill dismissed.

Jerome T. Congleton, of Newark, N. J. (George W. Wickersham, of New York City, of counsel), for complainant city of Newark.

Thomas J. Brogan, of Jersey City, N. J., for mayor and aldermen of Jersey City.

Thomas F. McCran, Atty. Gen. (Harrison P. Lindabury, of Newark, N. J., of counsel), for the State of New Jersey.

George Holmes, of Jersey City, N. J., and R. V. Lindabury, of Newark, N. J., for defendant Central R. Co., of New Jersey.

Julius Henry Cohen, of New York City, for defendant Port of New York Authority.

LYNCH, District Judge. The complainants seek to restrain the defendant the Central Railroad Company of New Jersey (hereinafter referred to as the railroad company) from erecting a steel and concrete bridge with bascule draws across the mouth of Newark Bay, to take the place of a wooden bridge having bascule draws which the railroad has maintained there for many years. The railroad company moves to

dismiss the bill of complaint on the ground that it sets up no cause or causes of action. Considering the contents of the bill as admitted, the court is called upon to determine whether in law a prima facie case is presented. If there is, restraint may issue. If there is not, the bill must be dismissed.

[1] For many years the states, unhampered by Congress, authorized the construction of bridges over navigable waters lying entirely within their confines. From an early date the state has been recognized as the source of authority in the absence of action by Congress. Willson v. Black-Bird Creek Marsh Co., 2 Pet. 245, 7 L. Ed. 412; Escanaba v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442.

But it is conceded that such waters are subordinate and subject to the paramount right and authority of the United States under the federal Constitution. It is for Congress to determine when it will exercise its power. Its mere silence or inaction when a corporation, under the authority of a state, places a structure across a navigable waterway, cannot have the effect of casting upon the federal government an obligation not to subsequently exert its constitutional power.

The waters of Newark Bay at the bridge site are navigable, and lie wholly within the state of New Jersey. The existing bridge of the railroad company was authorized, constructed, and maintained solely by virtue of the authority of an act of the Legislature of the state of New Jersey approved February 23, 1860 (P. L. p. 157), entitled "A further supplement to an act entitled 'An act to incorporate the Somerville and Eastern Railroad Company,' passed February 26, 1847."

[2] In March, 1899 (many years after the bridge was built), Congress adopted what is known as the "United States River and Harbor Act" (30 Stat. 1121), which provides that the *consent* of Congress must be obtained whenever it is planned to build bridges across navigable rivers. This, it is recognized, was an assertion by Congress of its dormant power, and the practice thereafter, upon obtaining authority to construct from the state, was to secure the consent of the government, as required by this 1899 act. This practice continued until 1906, when Congress passed a law entitled "An act to regulate the construction of bridges over navigable waters." This act, which is commonly known as the "Bridge Act of 1906" (Comp. St. § 9961 et seq.), provided that whenever authority is granted by Congress to construct or maintain a bridge across or over any of the navigable waters of the United States, a bridge shall not be built or commenced until the plans have been submitted to and approved by the Secretary of War, and further that any bridge built in accordance with the provisions of such act shall be a lawful structure and shall be recognized and known as a post route. In pursuance of this act of 1906 the railroad company has secured the passage by Congress of an act entitled "An act to authorize the Central Railroad Company of New Jersey to construct a bridge across the navigable waters of the Newark Bay, in the state of New Jersey," approved August 8, 1919 (41 Stat. U. S. 277).

Did the act of 1906 have the effect of extending federal power (the dormant federal power) so as to exclude all state control? "Where there is a conflict, the state legislation must give way. Indeed, when

Congress acts in such a way as to manifest its purpose to exercise its constitutional authority the regulating power of the state ceases to exist." Erie Railroad Co. v. New York, 233 U. S. 671, 34 Sup. Ct. 756, 58 L. Ed. 1149, 52 L. R. A. (N. S.) 266, Ann. Cas. 1915D, 138.

There is only one case that I am aware of in which the effect of the Bridge Act of 1906 has been considered, and that is the case of People v. Hudson River Connecting Railroad Corporation, 228 N. Y. 204, 126 N. E. 801 which was argued in the Court of Appeals of New York on December 9, 1919. The pertinent facts there were as follows: In April, 1913, the New York state Legislature granted the Connecting Railroad the right to construct, maintain, and operate a bridge with more than one span over the Hudson river at a point where its navigable waters were wholly within the state of New York. Laws N. Y. 1913, c. 388. In March, 1914 (38 Stat. 308), in language identical with the language used in the instant case, Congress granted the Connecting Railroad authority to construct, maintain, and operate a bridge and approaches across the Hudson at the same site according to the provisions of the federal Bridge Act of March, 1906. In May, 1917, the plans were approved by the Secretary of War, as required by the Bridge Act. But in June, 1917, the New York Legislature repealed its law of April, 1913, and passed a law authorizing a bridge with but one span, a different kind of a bridge than that authorized by Congress. Laws N. Y. 1917, c. 713.

There being a conflict between the government and the state, the court of last resort of the state, by a unanimous vote, decided that Congress, in adopting the Bridge Act of 1906, exercised its plenary power, and its action excluded any further or other action by the state. I quote from the opinion of Judge Elkus:

"What other or higher authority could be given to construct a bridge than an act of Congress stating in terms that such authority is granted? Grant having been made as required by the Bridge Act, the condition governing application of that act has been complied with, and Congress, under its authority over commerce, has declared the bridge to be erected over a navigable stream to be a lawful bridge. Certainly the state cannot make unlawful that which Congress, under its plenary power over interstate commerce has declared to be lawful. [Cases cited.] * * * The plenary power of Congress under the Constitution lies dormant until Congress sees fit to exercise it and in this twilight zone of suspended power the sovereign power of the state is supreme, and rights vested during that period under state authority are not subsequently lost when Congress exercises its plenary power, although the entire authority of the state may be superseded as in the cases of bankruptcy and coinage. * * * Congress having declared the bridge proposed to be erected lawful and authorized the defendant to erect same, no authority remained in the state to make any new or other regulations or requirements."

The Attorney General of the state of New York sought a review of this decision in the United States Supreme Court, but a writ of certiorari was denied.

Prior to the decision in the Connecting Case just referred to there was an allusion to the Bridge Act of 1906 in a decision of the United States Supreme Court in the case of Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523, argued December 5 and 6, 1906. In that case Justice Harlan, in reviewing legislation

affecting the power of Congress over navigable waters, said "Finally, we have the Act of March 23d 1906;" but that is all he said about it. An analysis of the court's lengthy opinion discloses that a construction of this act was not necessary to a determination of the matter which was then before the court.

The complainants call my attention to the case of International Bridge Co. v. New York, 254 U. S. 126, 41 Sup. Ct. 56, 65 L. Ed. 176, argued in the United States Supreme Court on December 6, 1919, and reargued on October 11 and 12, 1920 (reviewing the Court of Appeals of New York in 223 N. Y. 137, 119 N. E. 351). There was involved there the remodeling of an international bridge between New York and Canada. The international bridge had been authorized originally by the joint action of the state of New York and the Dominion of Canada, with the approval of Congress, and the Supreme Court considered the right of Congress to authorize changes without the concurrence of New York. The original act of Congress of 1870 (16 Stat. 173) mentioned the bridge as being built "in pursuance of" the New York statutes. The court, in considering the Act of March 3, 1899, held that that act did not make Congress the source of the right to build, but assumed that the right came from the state. After critically examining all of the legislation which controlled that particular situation, the court stated that it could not discover any intent on the part of Congress to withdraw state control, but that, on the contrary, there was an assumption that that control (of the state) was to remain. The act of 1906, the effect of which we are now considering, was not mentioned by Justice Holmes, who spoke for the court.

The International Bridge Case was later distinguished from the Connecting Bridge Case by Judge Elkus in his opinion in the latter case, supra. Referring to the International Bridge Case, he observed that the United States granted nothing to the Bridge Company, but merely consented to " 'any bridge * * * constructed across the Niagara river * * * in the pursuance of the provisions of an act of the Legislature of the state of New York,' " etc. So the only judicial construction of the Bridge Act of 1906 is contained in the pronouncement of the highest court of a state, which unanimously decided that the state may be completely ignored when Congress authorizes a bridge under the authority of that act; that, when Congress so authorizes a bridge, it asserts exclusive control of the situation.

[3] The railroad company in the instant case is in a far more advantageous position than was the railroad in the People v. Connecting Railroad Case, supra. In the instant case, while the proposed bridge is, in a sense, to be "new," it is in reality but the modernizing of a structure which originally was duly authorized by the state of New Jersey, and which has been in continuous use for approximately 60 years.

Under the New Jersey Act of February 23, 1860, the railroad company was authorized to "construct a bridge." No particular kind of a bridge was specified. Maintaining its bridge under state authority, does it not, in the absence of restrictive or preventive action on the part of the state, possess the right to repair its bridge, or improve it,

or, if deemed advisable, replace it by a modern structure? In the event of its destruction by fire or otherwise would the railroad company not have the right to rebuild it?

On this subject the case of Western Union Telegraph Co. v. Polhemus, 178 Fed. 904, 102 C. C. A. 105, 29 L. R. A. (N. S.) 465, is instructive. In that case the Circuit Court of Appeals for this circuit was dealing with the planting of renewal and additional telephone poles on an admitted right of way in front of property without the consent of the owners thereof. The point decided was that an easement expands to the call of its full enjoyment. Although it was not a railroad improvement with which the court was concerned, Judge Buffington, speaking for the court, took occasion to refer to and approve cases considered by other courts where improvements on railroads were involved. The principle is the same. I quote from his opinion:

"Indeed, at an early day, Chief Justice Shaw, in Brainard v. Clapp, 64 Mass. 6, 57 Am. Dec. 74, held that the easement acquired by a railroad was 'an appropriation of the land to all the uses of the land for the road, necessary and incidental; * * * that the right and power of the company to use the lands within their limits may not only be exercised originally, when their road is first laid out, but continues to exist afterwards. And if, after they have commenced operations, it is found necessary,' etc., 'to make further use of the lands, for purposes incident to the safe and beneficial occupation of the road, by,' etc., 'they have the right to do so to the same extent as when the railroad was originally laid out and constructed. All the reasons of necessity, propriety, and fitness which apply to the one case are equally applicable to the other.' And, referring to the broader use of the easement, he says: 'The case of railroads may be regarded as standing on somewhat stronger grounds in this respect for several reasons: Because railroads are extremely costly, and proprietors cannot in the outset make and complete all the works which they contemplate and intend to make; because these works are comparatively new, and improvements are constantly making in the structure and management of the works, and thus companies may profit by their own experience and that of others; and because an increase in the business of carrying passengers and freight may call for new works after the roads have gone into operation, and these are new exigencies calling for a new use of the land assigned to them.' And this future exercise of easement rights seems to have been generally followed, and was recognized in this circuit in Lake Shore & M. S. Ry. Co. v. New York, C. & St. L. Ry. Co. (C. C.) 8 Fed. 858, by Judge McKennan, who, where one railroad sought to condemn in part the easement of another, said: 'At the points of the alleged conflict, no actual encroachment upon these rights can be sanctioned or allowed; and in measuring their extent there must be a liberal consideration of the future as well as the present necessities of the complainant, touching the use of the existing tracks, the construction of additional ones, the convenient storage of its freight at all seasons, and the unembarrassed transaction of its freight business.' And in Western Union Telegraph Co. v. Pennsylvania R. R. Co. (C. C.) 120 Fed. 366, affirmed 195 U. S. 594, 25 Sup. Ct. 150, 49 L. Ed. 362, wherein it is said: 'We deem the question therein mentioned as to the future needs of a railroad in fulfilling its chartered purpose, such as should receive thoughtful regard and due consideration before it is deprived of any part of its right of way.'"

[4] Nevertheless the complainants insist that this "new" bridge cannot be built without the approval of the state board of commerce and navigation and the port of New York Authority. Has the state, by appropriate action, vested either of these bodies with any power or authority in the premises? The statutes under which the board of

commerce and navigation functions require corporations planning development of water fronts on navigable waters of the state to first secure the approval of the state board whenever such plans involve the construction, change, alteration, or modification of a bridge. I think it is obvious that these statutes, passed many years after the railroad company placed its bridge over the bay, were not intended to vest in the state agency thereby created the right to say that a railroad company might not replace its bridge constructed under state authority. How can the replacement of a bridge along a railroad right of way possibly be regarded as a plan for the development of water frontage?

And as to the Port Authority, a sort of semisovereignty created by the states of New York and New Jersey, with the approval of Congress: It is axiomatic that neither Congress nor the Legislature of a state can delegate its general powers. And the Port Authority, apparently directed by men of vision, has proceeded, so far as endeavoring to secure power is concerned, with commendable caution. In the present situation the Port Authority has not asserted itself in any way. It is brought into court as a defendant and states that if it has any duties to perform in the premises it will gladly perform them. Newark Bay is in the district over which the Port Authority has been given some jurisdiction, and the question arises: Has Congress and the state delegated to the Port Authority the power to deal with the railroad company's present bridge, or any replacement thereof?

The "comprehensive plan" of the Port Authority, adopted with the approval of Congress and the New York and New Jersey Legislatures, does not provide for the demolition of the railroad's present wooden bridge, nor for the demolition of the Brooklyn Bridge, or the Williamsburg Bridge, or the Fifty-Ninth Street Bridge, or the Pennsylvania Railroad, Lackawanna Railroad, Erie Railroad, or Hudson "Tube" Railroad bridges, which cross the Hackensack and Passaic rivers, or so far as I can discover, the demolition of any existing structures now carrying interstate traffic over navigable waters lying in the territory allotted to the Port Authority. The district of the Port Authority runs as far north as Irvington on the Hudson, New York, as far east as Long Beach, Long Island, as far south as Atlantic Highlands, and as far west as Summit, N. J. There are maintained at present in this district all sorts of bridges over navigable waters, not only railroad bridges, but also bridges designed to accommodate other modes of vehicular traffic. An examination of the statutes under which the Port Authority operates discloses no present authority to do away with any of these structures.

While Congress and the interested state Legislatures are contributing their support to the improvement of transportation facilities by the Port Authority, none of those bodies has, nor has the Port Authority itself, yet attempted to attack the existing rights of corporations operating structures originally authorized by law. The fact that the use of this bridge is not contemplated in the present comprehensive plan of the Port Authority does not mean that it cannot be included therein. There is nothing to prevent an alteration of the comprehensive plan. There is nothing to prevent its complete abandonment. By appropri-

ate action the railroad's bridge could be made a part of it. And the fact that it (this bridge) is not now a part of it does not mean that it is, or that a new structure in its place would be an unlawful structure.

That Congress has not attempted to divest itself of its jurisdiction over the situation may be gathered from a reading of the Public Resolutions of Congress referred to in the bill of complaint (42 U. S. Stat. 822), wherein it is provided:

"That nothing herein contained shall be construed as impairing or in any manner affecting any right or jurisdiction of the United States in and over the region which forms the subject of said agreement."

I am of the opinion that the Port Authority is not now possessed of authority to proceed against this lawful bridge, but if it were, and should desire to take affirmative action, it would undoubtedly first avail itself of the following provisions of article XIII of the compact creating it, which provides that:

"The Port Authority may petition any Interstate Commerce Commission (or like body), Public Service Commission, Public Utilities Commission (or like body), or any other federal, municipal, state or local authority, administrative, judicial or legislative, having jurisdiction in the premises, after the adoption of the comprehensive plan as provided for in article X for the adoption and execution of any physical improvement, change in method, rate of transportation, system of handling freight, warehousing, docking, lightering or transfer of freight, which, in the opinion of the Port Authority, may be designed to improve or better the handling of commerce in and through said district, or improve terminal and transportation facilities therein."

As I indicated at the outset, this court is called upon to decide legal questions only, questions which have no relation whatever to the policy or advisability of fastening a steel and concrete structure across the mouth of this bay where, according to the bill, it appears that commercial activity is likely to increase. In my opinion these legal questions all resolve themselves one way. If, as was decided in the Connecting Railroad Case, supra, Congress in passing the Bridge Act of 1906 undertook the sole and exclusive control of situations such as here, the complainants are without a case. If, on the other hand, the Bridge Act of 1906 merely provided for the consent of Congress to a bridge duly authorized by a state, the complainants are likewise without a cause for action, for, as I have already pointed out, the railroad company has the unimpaired state authority to maintain its bridge at this crossing. It has the sanction of both the state and the federal government.

It is my conclusion that the complainants have presented no prima facie case, and it therefore becomes my duty to dismiss the bill of complaint.