26 N.J. Super. 106 (1953)
97 A.2d 186
THE A.P. SMITH MANUFACTURING COMPANY, PLAINTIFF,
v.
RUTH F. BARLOW, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided May 19, 1953.
*108 Messrs. Pitney, Hardin & Ward (Mr. Waldron M. Ward and Mr. Charles R. Hardin, Jr., appearing; Mr. Robert P. Weil, of the New York Bar, pro hac vice), for plaintiff.
Messrs. Stryker, Tams & Horner (Mr. Josiah Stryker appearing), for defendants, except the Attorney-General.
Mr. Theodore D. Parsons (Mr. Thomas P. Cook appearing), for the Attorney-General of New Jersey.
Messrs. Jackson, Nash, Brophy, Barringer & Brooks (Mr. Williamson Pell, Jr., appearing), amicus curiae.
STEIN, J.S.C.
This controversy presents questions of transcendent importance, the solution of which is not without considerable difficulty. The court is pleased to acknowledge that its task was appreciably lightened by the distinguished contribution made by all opposing counsel, whose excellent arguments, written and oral, revealed exhaustive *109 research and exceptional skill. The court itself is sensible of the fact that although the matter in dispute cannot be regarded as res nova, yet in this State there has been no judicial pronouncement on the validity of the state legislation here involved, enactments upon which the plaintiff relies in its quest for a favorable declaratory judgment and which legislation the defendants condemn as unconstitutional insofar as that legislation is sought to be applied to the plaintiff company. While the contest here relates to a very modest donation, $1500, made by the directors of the plaintiff company, a large and prosperous corporation, to Princeton University for the latter's general educational purposes, the questions thereby provoked and here presented are of great public interest and very materially touch the public welfare. Stripped to its simplest form, the question calling for decision is whether a New Jersey corporation, organized in 1896 to engage in industry for purposes of profit, may lawfully in 1951 donate from its funds for the general maintenance of an educational institution like Princeton University, private in nature, in the sense that it is privately supported, it being an institution where learning is advanced by the teaching of learned languages, the liberal arts and sciences, architecture, engineering, and political science. The plaintiff company, speaking through its directors, answers this question affirmatively and seeks justification in two acts of our Legislature, one being R.S. 14:3-13, L. 1930, c. 105, p. 353, as amended by L. 1931, c. 290, p. 724, and L. 1949, c. 171, p. 560, and the other being N.J.S.A. 14:3-13.1 through 13.3, L. 1950, c. 220, p. 553, adopted by the unanimous vote of both Houses. Since the 1950 act did not repeal the 1930 act and its amendments, and the two are not repugnant to one another, their provisions should be considered together. The earlier act permits corporations organized in this State to cooperate with other corporations and with natural persons in the creation and maintenance of community funds "or of charitable, philanthropic or benevolent instrumentalities conducive to public welfare," and their directors and trustees are permitted to expend for such *110 purposes such sums as they deem expedient and "as in their judgment will contribute to the protection of the corporate interests." The act imposes the limitation that if such expenditures in any calendar year amount in the aggregate to one percent of the capital and surplus of the company as of the end of the preceding year, then before any further like expenditure is made during the current year, ten days' notice must be given to the stockholders of the intention to make the further expenditure, specifying the amount thereof, with the further limitation that if stockholders holding 25% or more of the stock of the company object, such further expenditure shall not be made unless and until authorized at a stockholders' meeting. It will be observed that that act does not contain within its express language any reference to institutions or organizations engaged in educational or scientific activities or any civic activities conducive to the betterment of social and economic conditions. Such omitted specification does appear in the 1950 act. In that later enactment the Legislature declared it to be
"the public policy of this State that encouragement shall be given to the creation and maintenance of institutions or organizations engaged in * * * educational, scientific or benevolent activities or patriotic or civic activities conducive to the betterment of social and economic conditions; that such a policy will be in the public interest in that the public welfare will be thereby promoted."
The act further declares it to be a part of the said public policy that corporations organized under the laws of this State should be specifically empowered to contribute such moneys as in the judgment of the governing boards
"will conduce to the betterment of social and economic conditions, thereby permitting such corporations, as creatures of this State, to discharge their obligations to society while, at the same time, reaping the benefits which essentially accrue to them through public recognition of their existence within the economic and social, as well as within the legal, structure of society."
The act then grants to every domestic corporation in New Jersey the permissive power of making such contributions *111 as are mentioned in the aforesaid declaration of public policy. Limitations are, however, imposed upon this granted power of contribution. No such contribution may be made if at the time of the making thereof, or immediately thereafter, the recipient institution owns more than 10% of the voting stock of the donor corporation or of one of its subsidiaries. A further proviso is that a corporation having capital stock may not in any fiscal year contribute more than one percent of its capital and surplus as of the end of its preceding fiscal year, unless the excess contribution is authorized by the stockholders at a meeting. The act expressly preserves all existing rights and powers of companies with reference to appropriations, expenditures or contributions of like nature. Thus the ten-day notice requirement and the 25% stock objection provision contained in the 1930 act are preserved and continue to govern contributions made under the 1950 act.
Now as to the particular facts upon which the court is asked to consider the legislation aforementioned. The facts are not in dispute. The only evidence before the court is that adduced by the plaintiff. The defendants offered no proof. Thus the process of arriving at a decision is here considerably eased. Many of the facts testified to in this case by leaders of American Industry and by front-line educators are matters of such common, almost universal, familiarity that the court might well have taken judicial notice of them. It needs no proof that the universities and colleges of the land are eleemosynary institutions. Colleges were so characterized by Lord Mansfield in St. John's College, Cambridge v. Todington, 1 Burr. 200, and by Chief Justice Marshall in the ever-famous Dartmouth College case (Trustees of Dartmouth College v. Woodward), 4 Wheat. 518, 4 L.Ed. 629 (1819). At Princeton, as at most American universities and colleges, the tuition paid for instruction meets only fractionally the per capita cost of the education furnished. Not only that, but a large segment of the student body is assisted by scholarships and by direct financial aid from the school's treasury. So widespread has been for *112 many years this policy of aid to the needy student that it cannot in truth be said that any deserving youth of ambition and promise cannot obtain at some American university or college that aid, in whole or in part, necessary to put him through an under-graduate career and even a post-graduate course. Unlike the system of higher education in other countries, the tremendous growth and expansion over the years of the American universities and colleges have created and furnished to the youth of the land the broadest of opportunity for instruction and development in the area of advanced learning in arts and pure and applied science and in the field of economics and government. It is from the millions of young men and women who are the products of higher American education that industry has picked, and will have need to pick, its scientists and its business executives. It is the youth of today which also furnishes tomorrow's leaders in economics and in government, thereby erecting a strong breastwork against any onslaught from hostile forces which would change our way of life either in respect of private enterprise or democratic self-government. The proofs before me are abundant that Princeton emphasizes by precept and indoctrination the principles which are very vital to the preservation of our own democratic system of business, and government, particularly vital at this time when alien ideologies seek to impose themselves upon our habits and our dreams for the future. I cannot conceive of any greater benefit to corporations in this country than to build, and continue to build, respect for and adherence to a system of free enterprise and democratic government, the serious impairment of either of which may well spell the destruction of all corporate enterprise. Nothing that aids or promotes the growth and service of the American university or college in respect of the matters here discussed can possibly be anything short of direct benefit to every corporation in the land. The college-trained men and women are a ready reservoir from which industry may draw to satisfy its need for scientific or executive talent. It is no answer to say that a company is not so benefited unless such need is *113 immediate. A long-range view must be taken of the matter. A small company today might be under no imperative requirement to engage the services of a research chemist or other scientist, but its growth in a few years may be such that it must have available an ample pool from which it may obtain the needed service. It must also be remembered that industry cannot function efficiently or enjoy development and expansion unless it have at all times the advantage of enlightened leadership and direction. The value of that kind of service depends in great measure upon the training, ideologies and character of the personnel available. All of these considerations must lead the reflecting mind to the conclusion that nothing conducive to public welfare, other than perhaps public safety, is more important than the preservation of the privately supported institutions of learning which embrace in their enrollment about half the college-attending youth of the country. Even public safety depends heavily upon the educated mind; witness what scientific research at Princeton and elsewhere was able to accomplish in discovering and making of practical utilization what had since the beginning of time been the mystery of the atom. Princeton is preeminent in its encouragement of the searching mind both in science and in public affairs. Its preservation is indeed of first importance to the welfare of the State.
The court was furnished with proofs that Princeton, like most other privately supported institutions of higher education, is presently facing a serious threat, if not to its very existence then certainly to the extent of its public usefulness. High taxation against individual incomes and inflationary living costs have dried up the sources which heretofore nourished and sustained the school's activities. The school's budgetary deficits are mounting and are assuming threatening proportions. To turn to the State for help carries with it a certain decided disadvantage. The award of state funds is a matter of political administration. Such grants certainly present the hazard of political interference or control. The experience of the University of Louisiana, a state university, can hardly be forgotten. That school for a time *114 became a political football, a condition hardly to be courted. I am strongly persuaded by the evidence that the only hope for the survival of the privately supported American college and university lies in the willingness of corporate wealth to furnish in moderation some support to institutions which are so essential to public welfare and therefore, of necessity, to corporate welfare. What promotes the general good inescapably advances the corporate weal. I hold that corporate contributions to Princeton and institutions rendering the like public service are, if held within reasonable limitations, a matter of direct benefit to the giving corporations, and this without regard to the extent or sweep of the donors' business. The benefits derived from such contributions are nation-wide and promote the welfare of everyone anywhere in the land.
On July 21, 1951, plaintiff's board of directors adopted the following resolution:
"Whereas it appears that there is a growing recognition that corporations which in their own capacities enjoy many of the benefits of citizenship are under an obligation, greater in times of prosperity, to assume their part of the burdens of citizenship, one such burden being the support of voluntary charity, including the privately supported universities and colleges; and
Whereas it appears that in order to maintain, over a period of time, the conditions under which corporations in general and this corporation in particular can exist and do business for profit, it is necessary that understanding of the benefits to the nation flowing from private enterprise and corporate organization be continued and if possible broadened and strengthened; and
Whereas it appears that fundamental to such understanding is a knowledge of history, government, economics and kindred subjects; and
Whereas it appears that Princeton University is one of the most, if not the most important center of such teaching in the State of New Jersey; and
Whereas it appears that Princeton University is facing a progressively widening gap between the income from its endowment and the budgetary needs of its present program, before taking into consideration needs for expansion and development; and
Whereas it appears that through a moderate gift to Princeton University this corporation may assume its share of the aforementioned burdens of citizenship and thus gain the present benefit of *115 public recognition of its existence within the civic and social as well as within the legal and economic structure of society.
NOW THEREFORE, it is resolved:
(1) that it is in the best interests of this corporation that it join with others in the 1951 Annual Giving to Princeton University, to the extent of a contribution of $1,500.00 toward the maintenance of the university;
(2) that the sum of $1,500.00 is hereby appropriated for that purpose, to be transmitted by the treasurer of this corporation to Princeton University."
It should be noted that the plaintiff company was incorporated in 1896 under the Corporation Act of 1875, as amended. Its stated object was to engage in the business of manufacturing and selling water works equipment and related products. It maintains plants in East Orange and Bloomfield, New Jersey, where it manufactures valves, fire hydrants, special machinery and equipment, mainly for the water and gas industries of the country. It also sells its products to customers in foreign countries. It has been in business continuously since the time of its incorporation. The defendants, who object to the aforementioned resolution passed by the company's directors, contend that the $1500 contribution to Princeton, granted though not yet paid, is ultra vires, since there is no power in the charter of the company to make such contribution as the resolution calls for. They argue that the company may not use any of its corporate funds except in furtherance of its business needs, and only for the purpose of creating profit for its stockholders. They take the further position that since the corporation's charter constitutes a tripartite contract, one between the State and the company, between the company and its stockholders, and, lastly between the stockholders inter sese, it is not within the power of the Legislature to alter or impair that contract by the enabling or permissive legislation consisting of the 1930 and 1950 acts, above mentioned. They insist that if those statutes, or either of them, are so construed as to be made applicable to the proposed contribution to Princeton, those statutes, as so construed and applied, would violate Article I, Section 10 of the Constitution of the United States, prohibiting the enactment by any State of any law impairing *116 the obligation of contracts, and also Section 1 of the Fourteenth Amendment of the Constitution of the United States, which provides that no State shall deprive any person of life, liberty or property without due process of law. They further assert that those statutes, and each of them, if so construed and applied, would also violate Article I, paragraph 1, of the Constitution of New Jersey by depriving the stockholders of the plaintiff company of their property rights in the assets of the company, and would also violate Article I, paragraph 20, of the New Jersey Constitution, which provides that private property shall not be taken for public use without just compensation, and Article IV, Section VII, paragraph 3 of the State Constitution, which provides that the Legislature shall not pass any law impairing the obligation of contracts.
In the complaint the company asks judgment declaring that the contribution to Princeton was within the plaintiff's corporate powers and that said contribution was not and is not a misapplication of corporate funds due to any lack of power in the company to make the contribution. In their answer the defendants ask for a judgment declaring that the contribution would be a misapplication of corporate funds and an ultra vires act in violation of the property and contract rights of the defendants and of the other stockholders of the plaintiff company. Thus the issues of ultra vires and constitutionality are sharply drawn.
First as to ultra vires. It is settled law here and in England that a corporation or association possesses not only those powers which are expressly conferred upon it by its charter, franchise or articles of association, but also all incidental powers reasonably designed or required to give fuller or greater effect to the expressed powers. An expressed power to a company to sell its wares does not require that with it there be also expressed the right to advertise its merchandise by the public press, radio, television, or any of the infinite variety of media of publicity and promotion. Such activity is a power present by necessary implication. So in respect of good-will. Anything that tends to promote with the public a company's good-will is a reasonable measure *117 towards the corporate objective of earning profits. It is this philosophy which moved Congress to allow corporations to give up to 5% of their earnings to any established or recognized charity, educational institution (public or private), or other welfare organization. Contributions to such beneficiaries engenders respect and appreciation on the part of the general public and certainly places the giving corporation on a better platform of public esteem than the one who padlocks its treasury against appeals for the public good. Therefore, in a real sense the contribution here under consideration is one that would have a tendency to enlarge upon and improve that good-will which the plaintiff company already enjoys. Individuals who give to schools, hospitals, Red Cross, and the like enjoy far greater respect from their fellowmen than do those persons who tighten their purses against all appeals for such help. What is true as between individuals has undoubtedly the same impact between companies and between companies and individuals. There is also the broader question here involved, namely, that the contribution here in question is towards a cause which is intimately tied into the preservation of American business and the American way of life. Such giving may be called an incidental power, but when it is considered in its essential character, it may well be regarded as a major, though unwritten, corporate power. It is even more than that. In the court's view of the case it amounts to a solemn duty. This question must not be studied in the light of that earlier day when corporations were far fewer in number and had not developed in power and in influence to the point where the major part of the national wealth is owned by corporate entities. Nor must the matter be looked at through lenses which do not reflect conditions which did not exist 50 or 100 years ago: real, tangible threats to American business and American democracy. It is to the credit and the glory of the common law that it has always had within itself the seed of change, keeping pace with the march of the years and the advance of thought. Wherever it has lagged it has been because of a conservatism which was hesitant to recognize *118 the changing times and the need to revise the law's precedents. But always and eventually the common law caught up with the times and molded itself to the newer needs for the public good. An example of this occurred in England. Exactly 70 years ago the English Court of Chancery said, "Charity has no business to sit at boards of directors," Hutton v. West Cork Ry. Co., 23 Ch. D. 654, 673 (1883). Fifty years went by, with all the changes in industry that took place in that period, and the same court gave its judicial stamp of approval to a contribution of £ 100,000 voted by a chemical company to several English universities for "the furtherance of scientific education and research." See Evans v. Brunner, Mond & Co., Ltd., L.R. [1921], 1 Ch. D. 359. This change in judicial perspective is ably discussed in a recent article entitled, Corporation Support of Education: The Legal Basis, published in the February 1952 issue of the American Bar Association Journal, vol. 38, No. 2, page 119.
I know of no decisions in this State which are in conflict with the progressive thinking reflected by the decision in Evans v. Brunner, Mond & Co., Ltd., supra. If any such there are, they are probably of such old vintage that they should not be regarded as controlling in this day and age and under the conditions that now prevail and the particular circumstances which attend the problem calling for the court's decision in this case. Emancipation from earlier constricting attitudes and holdings is part of the process of judicial growth and public service. The application of this idea to expanding corporate power was pointedly expressed more than 50 years ago by the New York Supreme Court in Steinway v. Steinway & Sons, 17 Misc. 43, 40 N.Y.S. 718, 720 (1896), where was said the following:
"As industrial conditions change, business methods must change with them, and acts become permissible which at an earlier period would not have been considered to be within corporate power."
Now as to the constitutional question. The constitutional objections raised by the defendants under both *119 Federal and State Constitutions are substantially alike. So considered they amount to the claim that the legislation here in question impairs the obligation of contracts, deprives the defendants of property without due process, and, finally, constitutes a taking of private property for public purposes but without compensation. I do not regard those objections as tenable. The granting of the charter by the State to the plaintiff company has at all times been subject to the reserved power of the State to alter, suspend or repeal the same, in the discretion of the Legislature. This reserve power has received in our decisions a broad construction, the important limitation being that a legislative enactment which has the effect of altering an ante-dating charter shall not run afoul of constitutional guarantees. In Grausman v. Porto Rican-Am. Tobacco Co., 95 N.J. Eq. 155 (Ch. 1923), affirmed 95 N.J. Eq. 223 (E. & A. 1923), the court said (at p. 160):
"However, it needs no argument or citation of authorities to prove that there is a disinclination to disturb legislative enactments unless their conflict with the organic law is apparent. It does seem to me, however, that the needs of commerce, as evidenced by the rapid adoption of the no-par stock idea, is something that may properly be taken into account unless it is clear that it does contravene the constitution, not in some fanciful or far-fetched manner, but substantially and in real effect."
See Bingham v. Savings Invest., etc., E. Orange, 101 N.J. Eq. 413 (Ch. 1927), affirmed in 102 N.J. Eq. 302 (E. & A. 1928). In that case Vice-Chancellor Backes, overruling constitutional objections voiced by stockholders, said:
"The power of the state, however, under its reserve power, to alter or amend charters, in respect of the contract created between the state and the corporation, is absolute, to protect the rights of the public, carry into effect the original purposes of the grant, and to promote the due administration of corporate affairs; and if, incidentally, injury to stockholders ensues, they must submit under their implied contract with the state to suffer it. The office of the reserve power, in our organic and statutory law, is to safeguard the public interests in corporate grants, which without the reservation would under the rule in the Dartmouth College Case be an irrevocable contract. Under the reservation, Justice Gray says, in Inland Fisheries Com'rs v. Holyoke Water Power Co., 104 Mass. *120 446; [Holyoke Co. v. Tyman], 15 Wall. 500, [21 L.Ed. 133], and it has been universally accepted as the true rule, the state is authorized to make any alteration or amendment in a charter granted subject to it, which will not defeat or substantially impair the object of the grant, or any rights which have vested under it, and that the legislature may deem necessary to secure either that object or other public or private rights * * *."
In the case of In re Collins-Doan Co., 3 N.J. 382 (1949), the court held that the act of incorporation is not alone a contract between the company and the State but also one between the company and its stockholders and between the stockholders inter se. It was there said that a company is subject to all amendments which the Legislature may make to the General Corporation Act, that such amendments are a part of the charter of every company formed at any time, that the Corporation Act may be amended or repealed at the pleasure of the Legislature, and that every corporation is bound by such action and that the charter of every company is subject to alteration, suspension and repeal, in the discretion of the Legislature. It was further said in that case that those rights, so reserved, extend to the contract between the State and the corporation and that "the contractual rights of the stockholders inter se are not proof against `alteration required by the public interest.'" That the legislation here under attack is a matter relating to the public interest and one realistically touching and affecting the public welfare, need be argued no further. The duty to serve and promote the public interest and common welfare provokes and sustains the exercise of the State's reserve power. Particularly is this true where, as in the instant case, the legislation "will not defeat or substantially impair the object of the grant." It cannot be earnestly suggested that the limited contribution allowed by the statutes in question "defeats or substantially impairs" the object of the grant of corporate power to the plaintiff. Even if it were assumed that the diversion of a corporate sum within the limits of the statutes does in some mathematical measure impair the rights of stockholders, it is not a substantial impairment within the quoted language from Bingham v. Savings Invest., etc., E. Orange, supra. *121 Certainly it is not such diversion as defeats the State's sanction that the plaintiff company conduct its chartered business. I therefore hold that the acts of the Legislature here under discussion are well within the reserve power of the State and that the exercise of that power is binding not alone upon the company but upon its stockholders in respect of their contract inter se.
Nor do the acts in question offend against Article I, Section 10 of the Federal Constitution. The Supreme Court of the United States has many times held that any act passed by a state under its reserve power does not impair the obligation of a charter contract. I refer only to the cases of Miller v. State, 15 Wall. 478, 21 L.Ed. 98 (1873) and Looker v. Maynard, 179 U.S. 46, 21 S.Ct. 21, 45 L.Ed. 79 (1900), voting rights changed; Greenwood v. Freight Co., 105 U.S. 13, 26 L.Ed. 921 (1881), charter repealed; Polk v. Mutual Reserve Fund, 207 U.S. 310, 28 S.Ct. 65, 52 L.Ed. 222 (1907), business change from cooperative and assessment life insurance to life insurance of every kind; Stockholders of Peoples Banking Co. v. Sterling, 300 U.S. 175, 57 S.Ct. 386, 81 L.Ed. 586 (1937), bank stockholders' liability changed; Veix v. Sixth Ward Ass'n, 310 U.S. 32, 60 S.Ct. 792, 84 L.Ed. 1061 (1940), withdrawal rights of building and loan association stockholder changed.
The reserve power has been held to save from invalidity under the Contracts Clause other forms of corporate regulation much more burdensome than the New Jersey charitable contribution statutes. Charles River Bridge v. Proprietors of Warren Bridge, 11 Pet. 420, 9 L.Ed. 773 (1837), charter contract strictly construed, benefit of exclusive franchise not implied, competing franchise granted; Holyoke Co. v. Lyman, 15 Wall. 500, 21 L.Ed. 133 (1873), manufacturing company whose charter permitted it to dam river required to construct a fishway; Shields v. State of Ohio, 95 U.S. 319, 24 L.Ed. 357 (1877), Spring Valley Water Works v. Schottler, 110 U.S. 347, 4 S.Ct. 48, 28 L.Ed. 406 (1884), Stanislaus County v. San Joaquin C. & I. Co., 192 U.S. 201, 24 S.Ct. 241, 48 L.Ed. 406 (1904), rate regulation imposed; *122 Fair Haven & W.R. Co. v. City of New Haven, 203 U.S. 379, 27 S.Ct. 74, 51 L.Ed. 237 (1906), trolley company required to pave streets; International Bridge Co. v. New York, 254 U.S. 126, 41 S.Ct. 56, 65 L.Ed. 176 (1920), bridge company required to supply additional facilities.
Nor does the legislation in question offend the Fourteenth Amendment of the Federal Constitution. State statutes passed pursuant to the reserve power have likewise been held not to operate as a deprivation of property without due process of law, even though more burdensome than the New Jersey charitable contribution statutes. St. Louis, Iron Mountain Ry. v. Paul, 173 U.S. 404, 19 S.Ct. 419, 43 L.Ed. 746 (1899), severance pay provisions imposed; Erie R. Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155 (1914), semi-monthly wage payment required; Sutton v. State of New Jersey, 244 U.S. 258, 37 S.Ct. 508, 61 L.Ed. 1117 (1917), street railway corporation required to carry police officers free of charge; Marcus Brown Holding Co. v. Feldman, 256 U.S. 170, 41 S.Ct. 465, 65 L.Ed. 877 (1921), emergency rent laws sustained; Home B. & L. Ass'n v. Blaisdell, 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934), mortgage moratorium law sustained.
Finally, the legislation challenged in this case is clearly sustainable under the police power reserved to and residing in each State. "The police power of a state is an inherent attribute of its sovereignty with which it is endowed for the protection and general welfare of its citizens, and of which the state may not divest itself by contracts or otherwise." See 12 C.J. § 603, p. 991, 16 C.J.S., Constitutional Law, § 281, and Boston Beer Co. v. Com. of Massachusetts, 97 U.S. 25, 33, 24 L.Ed. 989 (1878). In the last cited case Mr. Justice Bradley, speaking for the United States Supreme Court, said:
"Whatever differences of opinion may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health and property of the citizens, and to the preservation of good order and the *123 public morals. The Legislature cannot, by any contract, divest itself of the power to provide for these objects. They belong emphatically to that class of objects which demand the application of the maxim, Salus populi suprema lex; and they are to be attained and provided for by such appropriate means as the legislative discretion may devise. That discretion can no more be bargained away than the power itself."
Every person joining a chartered corporate enterprise does so subject to the paramount police power of the State. "All contracts, whether made by the state itself, by municipal corporations, or by individuals, are subject to be interfered with, or otherwise affected by, subsequent statutes enacted in the bona fide exercise of the police power, and do not, by reason of the contracts clause of the constitution, enjoy any immunity from such legislation." See C.J. reference, supra. Griffith v. State of Connecticut, 218 U.S. 563, 31 S.Ct. 132, 54 L.Ed. 1151 (1910); Hudson County Water Co. v. McCarter, 209 U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908), affirming 70 N.J. Eq. 695 (E. & A. 1906). In the last-cited case Justice Oliver Wendell Holmes expressed, with that genius which was his, the rule of and the limitation upon the police power reserved unto the several states. He said, 209 U.S. at page 355, 28 S.Ct. at page 531, 52 L.Ed. 828:
"All rights tend to declare themselves absolute to their logical extreme. Yet all in fact are limited by the neighborhood of principles of policy which are other than those on which the particular right is founded, and which become strong enough to hold their own when a certain point is reached. The limits set to property by other public interests present themselves as a branch of what is called the police power of the state. The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side. For instance, the police power may limit the height of buildings in a city, without compensation. To that extent it cuts down what otherwise would be the rights of property. But if it should attempt to limit the height so far as to make an ordinary building lot wholly useless, the rights of property would prevail over the other public interest, and the police power would fail. To set such a limit would need compensation and the power of eminent domain."
*124 I have already indicated that the legislation which the defendants question is something which not alone substantially affects the public welfare but vitally concerns our national economy and our form of government. The acts under attack were not passed under some guise. In the 1950 act the Legislature in the clearest of language expressed and declared that the enactment was passed in the public interest and to promote the public welfare, so that there shall result a betterment in the social and economic conditions of our people. Ordinarily the declaration of policy by the Legislature is final, binding and conclusive upon the judicial branch of the government. Only when the declaration by the Legislature is illusory and is intended, by the cloak of police power, to mask some unreasonable or illegal purpose, may the court strike down such declarations of policy. There is no such infirmity in the acts involved in the present litigation. The reasons and purposes declared by the Legislature are substantial and their factual validity is a matter of common recognition. I therefore hold that since those acts are well within the police power of the State, no earlier act on the part of the State, such as the antecedent Corporation Act under which the plaintiff company was chartered, has or could have the effect of barring, in the constitutional sense, the two acts in question.
Since the company and its stockholders acquired their contractual rights subject and subordinate to the reserve power of the State to alter that contract, and subject also to the paramount police power of the State, both the company and its stockholders must be held constructively to have acquiesced in the legislation of which they here complain. That being so, the defendants have no property interest in the maintenance and continuance of what counsel has called the "status quo," meaning thereby that their rights of participation in the earnings of the company shall continue forever, precisely as they originally were and altogether unaffected. It therefore follows that the charitable contribution statutes assailed by them do not operate to deprive them of any vested property interest. In Polk v. Mutual Reserve *125 Fund L. Ass'n, 207 U.S. 310, 28 S.Ct. 65, 71, 52 L.Ed. 222 (1907), it was said that the same reasoning which leads to the conclusion that "changes in the charter powers, made under the reserved powers of the state, do not violate the contract clause of the Constitution, is apt to show that they do not violate the 14th Amendment."
It is therefore held that the legislation in question is valid as applied to the resolution of the plaintiff's directors, by which action a contribution was granted to Princeton University.
A declaratory judgment as demanded by the plaintiff will be entered and the declaratory judgment demanded by the defendants will be denied